UNITED STATES, Appellee

v

JOSEPH R. HINES, Technical Sergeant, U. S. Air Force, Appellant

7 USCMA 75, 21 CMR 201

No. 6864

Decided May 25, 1956

Captain *Cornell DeGrothy* argued the cause for Appellant, Accused. With him on the brief were *Colonel A. W. Tolen* and *Lieutenant Colonel Stanley S. Butt*.

Lieutenant Colonel *Emanuel Lewis* and Captain *Anthony Ortega, Jr.*, argued the cause for Appellee, United States. With them on the brief was *Lieutenant Colonel Francis P. Murray*.

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused was convicted by a general court-martial of two assaults; of offering violence to a superior officer; of being drunk and disorderly in command; and of incapacitating himself for the proper performance of his duties because of drunkenness; in violation of the Uniform Code of Military Justice, Article 128, 50 USC § 722; Article 90, 50 USC § 684; and Article 134, 50 USC § 728, respectively. He was sentenced to a bad conduct discharge, total forfeitures, and three years' confinement at hard labor. The convening authority reduced the confinement to eighteen months, but otherwise approved, and the board of review affirmed. Since we granted review to determine the sufficiency of the evidence with respect to the two assaults and the offering of violence to a superior officer, only the facts bearing upon those offenses will be recited.

The accused attended a promotion party at Clark Air Force Base. He became intoxicated and was taken to his quarters on the Base. Thereafter, at approximately 7:00 p.m., the Base Officer of the Day, Captain Bartron, received a complaint respecting a disturbance at the accused's quarters. Bartron, in company with an Air Police sergeant, after first ascertaining the nature of the difficulty from the ac-

cused's wife and neighbors, proceeded to the accused's residence. As they approached, a light flashed on and off in the house. During the brief illumination, Captain Bartron observed a man standing in the frontroom holding a carbine. At approximately this same time the accused's Commanding Officer, Major Whitten, accompanied by Lieutenant Colonel Cronin, arrived on the scene. Captain Bartron advised the newcomers that the accused was armed. Cronin and Whitten approached the house. According to Bartron, who had stationed himself nearby in the shadows, as they mounted the porch steps Whitten several times announced his name and rank, calling out, "Hines, do you know me? I am your commander." The accused retorted, "I know who you are. Get the . . . out of here." Afterward, as Whitten continued to entreat the accused to let them in, Bartron heard the bolt action of a carbine being operated. After some persuasion, the officers were able to prevail upon Hines to let them in the house.

Major Whitten testified that after learning of the disturbance, he proceeded to the accused's house with Colonel Cronin. As they walked onto the porch, he called out Hines' name three or four times. Additionally, as nearly as he could remember at the

**77**

trial, he identified himself to the accused. He received no answer, but as he reached for the screen door handle he heard the bolt action of a gun and a statement, "Don't move." When they finally effected an entrance into the house, the accused was holding a loaded carbine. The major was fearful for his safety when he heard the command not to move.

Colonel Cronin recalled that as he and Major Whitten approached the house the porch light was on. He believed the accused knew who they were, because he spoke their names before he ordered them not to enter the dwelling. At substantially the same time that he heard the order, he also distinctly heard the movement of a gun bolt. When he heard the gun, he was apprehensive because "the idea was there, that we could be shot if we did not watch our steps."

After entering the dwelling the officers pacified the accused, secured the loaded gun from him and persuaded him to accompany them in Major Whitten's jeep to the "drunk tank." As they progressed toward their destination the accused became increasingly excited and agitated. He stated that he had been a prisoner during World War II, and he was extremely fearful about being put "inside the fence." Eventually he seized Major Whitten by the shoulder and shook him, directing him with an oath to stop the jeep. Whitten stopped the jeep, summoned reinforcements, and the accused ended the unfortunate night's escapade in the guardhouse.

Assault may consist of an actual attempt to commit a battery, or it may result from an offer of violence to another which puts that party in reasonable fear that immediate force will be applied to his person. The overt act contemplated in the latter instance must be more than mere preparation. Words alone, or threats of violence to occur at some future date, are insufficient. Paragraph 207a, Manual for Courts-Martial, United States, 1951; United States v Norton, 1 USCMA 411, 4 CMR 3; Wharton, Criminal Law, 12th ed, §§ 799–800.

The facts of this case carry the actions of Hines far beyond the preparatory stage. Cronin and Whitten were aware of the accused's fight with his wife, and had been warned that he was armed. As they went up on the porch steps they called out their own names, as well as that of the accused. When Whitten tried the screen door, both officers heard what they positively identified as the sound of the bolt action of a gun being operated. After entry, the accused confronted them with a loaded carbine in his hands, and, although not pointed directly at either officer, it was ready for instant use. Under these circumstances, the fact that neither officer testified that the gun was pointed directly at him does not prevent the accused's action from constituting an assault. When a loaded gun is employed in this manner it is an assault whether or not the gun is pointed at the victim. Wharton, supra, § 802; Johnson v State, 132 Ark 128, 200 SW 982. Language in paragraph 207a, Manual for Courts-Martial, supra, also supports the position that a gun need not be pointed at a victim, "Some other examples of acts which may constitute an assault are . . . drawing a pistol from a holster or pocket with an actual or apparent (to the person assailed) intent to use it." Here the carbine had been placed in a firing position and the accused's sharp command not to move indicated a willingness to use the weapon. Working the bolt of a loaded weapon so that it is ready for instant firing, coupled with a statement indicating a present intent to use the weapon, certainly is more than mere preparation. It is a part of the use of the weapon itself, and such behavior constituted the overt act of the assault. While it is true that the victims were unable to see the accused, there is no mistaking the distinctive sound of the operation of a rifle bolt. These officers were experienced in the handling of firearms and, as Major Whitten testified, he simply could not be mistaken as to such a sound. This, coupled with testimony that the accused was seen with a carbine immediately before the assault, and had it in his hands immediately there-

after, is enough for us to hold the evidence sufficient to support the court-martial's finding of guilt of this assault.

The accused argues justification for his acts on the ground that Major Whitten and Colonel Cronin ▮▮▮▮▮ were trespassers. We are not prepared to hold that a commanding officer, who is called out to investigate a disturbance caused by one of his men, cannot proceed to the latter's premises, consisting of Government quarters on a military reservation, without committing a trespass. As a representative of the Government, the commanding officer had the authority to enter peaceably upon such premises. Paragraph 152, Manual for Courts-Martial, supra; United States v Doyle, 1 USCMA 545, 4 CMR 137. Furthermore, the officers went to the accused's house after consultation with the latter's wife. Mrs. Hines agreed that they should talk with her husband, and nothing in the record indicates that she was unable to grant the officers permission to enter her home for that purpose.

As to the offense alleged in Charge II, the issue is solely whether the facts show an unlawful and un-▮▮▮▮▮ reasonable application of force against the accused's Commanding Officer, Major Whitten. The defense argues that Hines was merely attempting to attract the Major's attention. We believe the evidence of record carries the accused's actions beyond that point. After considerable argument and persuasion, Hines was induced to accompany the officers in the jeep. He continued to voice his objections and to state unequivocally that, due to his experiences as a prisoner of war, he did not want to go "inside the fence." As the vehicle approached the guardhouse, Hines became violent, commenced crying and screaming, grabbed Major Whitten by the shoulder, shook him and demanded that he stop the ". . . jeep." The effect upon the Major was such that he deemed it expedient to stop the vehicle and secure reinforcements from the Officer of the Day. The trial court apparently felt that these actions were more than a mere attempt to attract another's attention. We are of the opinion that there is sufficient evidence in this record from which a reasonable mind could conclude that the guilt of the accused was established beyond a reasonable doubt.

The decision of the board of review is affirmed.

Judge LATIMER concurs.

QUINN, Chief Judge (dissenting):

The difficulty with the majority opinion is that the facts hardly fall within the areas defined by the principles of law relied upon. This Court has held that a superior officer does ▮▮▮▮▮ not always act in an official capacity when engaged with a subordinate. On the contrary, he may act in a completely private capacity. And when he does the legal effect of his conduct must be measured by that yardstick. United States v Dandaneau, 5 USCMA 462, 18 CMR 86; United States v Volante, 4 USCMA 689, 16 CMR 263.

Granting that Major Whitten and Colonel Cronin identified themselves, the evidence shows that ▮▮▮▮▮ they never indicated they desired admission to the accused's home in an official capacity. As a matter of fact, it appears from the evidence that Major Whitten, the accused's commanding officer, considered that he was acting in a private capacity. After he talked to the accused's wife, he was reluctant to intervene in the quarrel between her and the accused, which was the occasion for his appearance at the accused's home. He specifically asked her "if she were sure she wanted me to get into her family affairs." Major Whitten further said that he had "seen many cases where the commander tried to straighten out family difficulties, the wife takes the part of the husband and had hard feelings all the way around." Only when Mrs. Hines assured him that she would not interfere "in any way" did he agree to go to the accused. As for Colonel Cronin, he merely went along with Major Whitten "on a call he had." Even he appraised the situation as one of private

**79**

rather than official action. After he and Major Whitten heard the click of the accused's carbine, Colonel Cronin is reported to have said: "For Christ's sake, Hines, what do you think you are doing. We are friends of yours and want to help you!" This certainly is not the language of officiality. But, even if it is, neither officer directly or indirectly asserted a right to enter the accused's home in an official, as distinguished from a private, capacity. In United States v Adams, 5 USCMA 563, 18 CMR 187, this Court unanimously held that a serviceman is entitled to protect the privacy of his military home from non-official intrusion to the same extent that a civilian is entitled to exclude uninvited persons from his home. We said:

> "Generally a military person's place of abode is the place where he bunks and keeps his few private possessions. His home is the particular place where the necessities of the service force him to live. This may be a barracks, a tent, or even a foxhole. Whatever the name of his place of abode, it is his sanctuary against unlawful intrusion; it is his 'castle.' And he is there entitled to stand his ground against a trespasser to the same extent that a civilian is entitled to stand fast in his civilian home. No reason in law, logic, or military necessity justifies depriving the men and women in the armed forces of a fundamental right to which they would be entitled as civilians."

It is apparent, therefore, that such cases as Johnson v State, 132 Ark 128, 200 SW 982, in which a police officer lawfully attempted to arrest the accused are inapposite. Here, the accused had a lawful right to keep uninvited private persons out of his home. Preparing means to enforce that right is not an assault. Accordingly, I would set aside the findings of guilty of specifications one and two of Charge I and order the charges dismissed. But if it be contended that the accused took more than reasonable measures to insure his right of privacy, then the question of his reasonableness under the circumstances would be one of fact for the court-martial. The law officer did not instruct on that issue. At the very least, therefore, I would not affirm the findings of guilty but enlarge our order granting review to include the question of whether the failure of the law officer to instruct prejudiced the accused. I would permit both parties to submit briefs and argue the question.

Charge II and its specification alleges an assault upon Major Whitten, while he was acting in the execution of his office. Since Major Whitten testified that his purpose in getting the accused to leave his home and go to the "drunk tank" was to permit the accused's wife to go home to sleep, it would seem that he was still acting in a private capacity rather than in the execution of his office. More important, however, the evidence clearly shows that the accused did not assault Major Whitten while they were riding in the jeep.

After the Major and Colonel Cronin had gained access to the accused's house, they talked to him for a time about his difficulties with his wife. They then "suggested" that it would be "wise" for the accused to go to the "drunk tank" to sleep it off. They went out to Major Whitten's jeep. The accused got into the back seat and the Major and Colonel sat in the front, with the Major at the wheel. It is true that the record shows that after they had driven about halfway to the Correction Center, the accused put his hands on Major Whitten's shoulder, shook him, and among other statements, "uttered an oath." However, all the witnesses agree that the accused was not offering or attempting bodily harm to Major Whitten. The Major testified that the accused was crying. He kept "raving" about being back in a German prison camp, and repeating that he didn't want to go behind a barbed wire fence. He was quite drunk at the time, and the next day he had to be taken to the psychiatric ward of the hospital. Colonel Cronin described the accused as "hysterical" and "overwrought." His account of the incident in the jeep is as follows:

> "Q. Once you were in the jeep driv-

ing toward the place where you want the Sergeant to stay, did anything else occur while you were inside the jeep?

"A. All went rather well until we got perhaps half way to the barricade or close on the way to the barricade and Sergeant Hines suddenly realized that he was going to be locked up for the night, and he said he would rather not be locked up for the night.

. . . . .

"Q. Did you feel, sir, that when Sergeant Hines grabbed hold of your arm and Major Whitten's arms while you were in the jeep, that he was doing that to attract attention, and he was hysterical and in a frenzy state?

"A. It could be I would say—it would be more towards that, not trying to fight back at us.

"Q. He did not threaten you or Major Whitten in the jeep? Did he?

"A. I don't remember that he did.

"Q. And if he had done it, it would have been impressed upon your mind.

"A. I think so.

. . . . .

"Q. I realize this was six months ago . . . could it have been that Major Whitten was being bothered while at the wheel of the car?

"A. Yes . . .

"DC: I ask counsel not to use leading questions too freely.

"LO: I will allow that question.

"TC: I realize that this was quite sometime ago.

"A. It is hazy but I don't remember that Sergeant Hines did anything that you could clearly say was bodily . . . was intended for bodily harm to either one of us.

. . . . .

"Q. And certainly you did not observe him offer any violence to either yourself or Major Whitten.

"A. For myself, no . . . I don't know about Major Whitten—I did not—I cannot answer for Major Whitten, but as far as I could tell, I did not see anything that could be construed as violence except that he did have hold of our arms at times,

*pleading not to take him down to the stockade."*

The final witness to the jeep incident was Captain Bartron, Officer of the Day. He "followed close" behind Major Whitten's jeep en route to the Correction Center. He was motioned to come alongside. Thereupon, he proceeded "as closely as" he could to Major Whitten's jeep. He described what he observed as follows:

"Q. Did you notice anything out of the ordinary while the jeep was going along?

"A. Not until they reached the vicinity of Chapel #3 and where the stockade lights were in view, and a hand motion for me to come along side was made, and which I did, and the AP went to one side and I went on the road side as closely as we could. We got out and the major was driving, and the colonel was in the front seat, and Hines was in the rear seat. Hines had his hands on the shoulder of Colonel Cronin and I could not say exactly which—*and he was pleading with him not to take him there or lock him up.* I would say he was hysterical.

"Q. Was that the end of what happened?

"A. After he quieted down, he was silent and straightened up and Major Whitten said, 'We are all right. You still stay with me,' and Hines quieted down and they proceeded to the stockade. I got out and entered and the Air Police went on their business and I stayed with them and when we got inside, there was a great deal of more talking and . . ."

Only one conclusion can be drawn from this evidence, and that is that the accused did not commit an assault upon Major Whitten. He was "pleading" for relief, not offering bodily harm. The facts here are squarely within the rationale of our opinion in United States v Rutherford, 4 USCMA 461, 16 CMR 35. On the authority of that case, I would set aside the findings of guilty of Charge II and order the Charge dismissed.

One further matter requires atten-

**81**

tion. Joined with the charges considered above are two other  charges. One alleged that the accused was drunk and disorderly in the orderly room on July 16, 1954, and the other that on July 19, 1954, he incapacitated himself for the proper performance of his duties by his previous indulgence in intoxicating liquor. These offenses are entirely unrelated to the other charges. They are among the most minor offenses in military law. Manual for Courts-Martial, United States, 1951, paragraph 127c, Section A. It was, therefore, plainly improper to join these charges with one carrying a maximum penalty of confinement for life. Manual, supra, paragraph 26c. In my opinion, a staff judge advocate should not permit such a joinder. Cf. United States v DeAngelis, 3 USCMA 298, 12 CMR 54.