**UNITED STATES**

v.

**Mark W. YOUNGBLOOD, 462 35 4860,
Sergeant (E–5), U.S. Marine Corps.**

**NMCM 89 2310.**

U.S. Navy–Marine Corps Court of
Military Review.

Sentence Adjudged 6 Jan. 1989.

Decided 16 March 1990.

LT Robert E. Wallace, JAGC, USNR,
Appellate Defense Counsel.

LT Stephen Ponticiello, JAGC, USNR,
Appellate Government Counsel.

Before BYRNE, FREYER and
STRICKLAND, JJ.

FREYER, Judge:

Notwithstanding his pleas, this appellant stands convicted by a special court-martial composed of members, including enlisted members, of assault consummated by a battery upon a teen-age girl by choking her around the throat (as a lesser-included offense of assault with a means likely to produce death or grievous bodily harm), "simple assault" with a dangerous weapon [sic] on another teen-age girl (as a purported lesser-included offense of assault with a dangerous weapon), and communicating a threat. The court-martial returned the maximum sentence, which the convening authority approved. We specified an issue regarding the finding of "simple assault" with a dangerous weapon.

The record indicates that a small group of teen-age girls from the area adjacent to Camp Pendleton had formed a special relationship with certain members of the Military Police Battalion there. The full extent of this relationship is not developed in the record, but apparently it included flirtatious and immature teasing behavior on both sides, isolated acts of "machismo" on the part of a few Marines, and intrusions by the young girls into duty areas and settings where they obviously did not belong. One such intrusion led to a charge of aggravated assault against this appellant.

Specification 2 of Additional Charge I, to which the specified issue relates, is as follows:

In that Sergeant Mark W. Youngblood, U.S. Marine Corps, Headquarters and Service Company, Military Police Battalion, Marine Corps Base, Camp Pendleton, California, did, at Camp Pendleton, California, on or about 1 September 1988, commit an assault upon Michelle Cieslinski by pointing and placing against her head a dangerous weapon, to wit: a loaded .45 caliber pistol.

The military judge instructed on the charged offense as an offer-type aggravated assault with a dangerous weapon, the lesser-included offense of assault consummated by a battery by placing the gun against the victim's head but not as a dangerous weapon, and the lesser-included offense of "simple assault," *i.e.*, an offer-type assault but without a dangerous weapon. (It appears that the allegation of "pointing and placing against her head" created an unusual instructional problem leading to the inconsistency of instructing on the principal and second lesser-included offenses as offer-type assaults with an assault consummated by a battery interposed between them.) Thus instructed, the members reached the following finding:

Guilty, except the words "pointing and placing against her head." Guilty of the lesser included offense, simple assault.

The literal effect of the members' finding was, therefore, to find that the appellant did, at the time and place alleged, commit an assault upon Michelle Cieslinski by a dangerous weapon, to wit: a loaded .45 caliber pistol.

In an Article 39(a) session after announcement of the findings, the following colloquy took place:

DC: And with respect to Specification 2, excepting what words, sir?

MJ: "Pointing and placing against her head." So, of the excepted words, not guilty; of the substituted words [?], guilty. Of the Charge, as excepted and substituted [sic], guilty, of a lesser included offense of simple assault *by pointing the weapon.*

DC: So, I take it, sir, they took out all of the—

MJ: They took out the placing with the weapon.

DC: —*the dangerous weapon, as well, sir.*

MJ: Yes.

DC: This is merely a simple assault?

MJ: This is a simple assault, yes. And that's what they intended. They have "guilty of the lesser included offense of simple assault."

DC: Aye, aye, sir.

(Emphasis supplied.)

 Considering both the literal effect of the members' finding and reasonable possibilities regarding their actual intent in light of the evidence presented, we responded to this state of the record by specifying the following issue:

CAN THE ANNOUNCED FINDING AS TO SPECIFICATION 2 OF ADDITIONAL CHARGE I, WHICH EXPRESSLY EXCEPTS THE WORDS "POINTING AND PLACING AGAINST HER HEAD" BUT INCLUDES THE WORDS "BY ... A DANGEROUS WEAPON, TO WIT: A LOADED, .45 CALIBER PISTOL", BE SUSTAINED AS A FINDING OF GUILTY OF SIMPLE ASSAULT?

Having carefully reviewed the evidence and considered the briefs of the parties and relevant authorities, we deem the issue presented to be one of some subtlety, and we regard the interpretation of the relevant finding by the military judge to be

only one, but by no means the most likely, of several possible findings intended by the members.

We begin with the principles clearly and concisely set forth in *United States v. Darden,* 1 M.J. 574 (A.C.M.R.1975). As the cases demonstrate, problems in this area generally arise when the members make findings by exceptions and substitutions, and appellate courts in such cases have disregarded technicalities, even to the point of treating a finding of not guilty by exceptions as a finding of guilty of the very same matters, *United States v. Williams,* 21 M.J. 330 (C.M.A.1986). Before this can be done, however, the intent of the members to find the accused guilty of those matters must be discoverable to a reasonable degree of certainty. In some situations, their intent may be deduced by reconstructing the mental processes whereby the members were presumably led to deviate from the correct announcement format; and an instruction, the findings worksheet, or just the complexity of the format may be identified as responsible for the irregularity. *Williams; United States v. Cameron,* 34 C.M.R. 913 (A.F.B.R.1964). In others, resort is had to the evidence, and, in effect, the members are presumed to have found the accused guilty of those factual matters of which the evidence shows the accused to be guilty, provided, however, that those matters are pertinent to a legally sustainable finding of guilty and the members have manifested in some fashion an intent to find the accused guilty. *United States v. Chism,* 31 C.M.R. 421 (N.B.R. 1961). It helps, of course, if the accused has admitted, or at least not disputed, those matters. *Williams.* The difficulty is not with the principles themselves, but with their application to particular cases, and so we turn to the specific facts of the case at hand.

In the early morning hours, the appellant was on duty at the relatively isolated San Luis Rey gate when Michelle Cieslinski and a young female friend of hers and the appellant's showed up, entered the gate house, and began to pester the appellant. The following excerpts from the direct and cross-examination of Michelle Cieslinski set

the stage for our application of the above legal principles:

Q. [by the trial counsel]: Okay. Now, when you were, or discussing—or with Sergeant Youngblood, did he have occasion to pull his weapon?

A. Yes.

Q. When did that occur?

A. Maybe 10—no, 15, 20 minutes after we got there.

Q. And you got there when?

A. A little after 12:00 maybe.

Q. What led up to this?

A. I don't know. We got in an argument, I guess. I don't really remember.

Q. Did you get in an argument with him?

A. Yeah, I think I made him mad.

Q. How did you make him mad?

A. I don't remember.

Q. What happened then? Would you tell us step-by-step what occurred?

A. I was talking to him and I said something *and he pulled out his weapon,* and he said something but I don't remember what it was. *And I said, "put your gun away or I'm going to report you," and I think I backed away or I pushed his hand away, and he put the gun back and that was it.*

Q. What about his night stick, did his night stick have occasion to hit the desk?

A. Um-hmm.

Q. Why did that occur, do you know?

A. Because I called him an asshole.

Q. And why did you do that?

A. Because he pissed me off.

Q. What [sic] was that?

A. When he pulled the gun on my head.

Q. What did he do with the weapon after he pulled it?

A. After he pulled the gun?

Q. He pulled it out of his holster.

A. The gun?

Q. Yes.

A. He put it to my head.

Q. *Did it touch you?*

A. *No, not—I don't remember, really.*

\* \* \* \* \* \*

Q. [by civilian counsel]: Were you scared?

A. At first maybe, yeah.

Q. And how about secondly?

A. Angry.

Q. Did you think he was going to hurt you? Did you think he was going to shoot you?

A. No, I did not.

Q. *Did you think he was going to harm you in any way?*

A. *No, I did not.*

Q. *What did you think?*

A. *That it was a joke.*

(Emphasis supplied.)

For his part, the appellant, when asked on direct examination if he had at any time put a pistol to Michelle Cieslinski's head, replied that he had not.

From the above testimonial excerpts and an examination of the findings worksheet, we have every reason to believe that the members' exception of the words "pointing and placing against her head" was not at all inadvertent, as in *Williams*, but was a direct response to Michelle Cieslinski's initial account to the effect that the appellant drew his weapon but that she pushed his hand away, and the appellant's denial that he put the gun to her head. On this state of the record, the members may well have entertained a reasonable doubt that the appellant had done any more than begin to display the gun, at which time Michelle Cieslinski pushed his hand away and, in her words, "that was it." In accordance with this entirely plausible version, the appellant would have neither pointed the gun at her nor placed it against her head. Consequently, we cannot agree with the military judge's interpretation of the finding as "simple assault by pointing the weapon," which, in our view, fails to give effect to the unambiguous expression by the members of an intention to find the appellant not guilty of pointing his gun at Michelle Cieslinski.

Before answering the question of how the members likely found that an assault was committed, we examine their decision to retain the words "a dangerous weapon, to wit: a loaded, .45 caliber pistol." The

answer, we believe, lies in the instructions. Since Michelle Cieslinski was unable to testify whether or not the appellant's gun was loaded, a considerable effort was made by the prosecution to prove in other ways that the gun was, in fact, loaded. At page 393 of the record, the military judge gave this instruction:

I'd like to talk to you a little bit about the weapon. A hand gun, when used as a firearm, and not as a club, for instance, may not be considered a dangerous weapon or a means likely to produce death or grievous bodily harm unless it's loaded. A functional magazine-fed weapon is a loaded weapon if it has inserted into it a magazine containing a round of live ammunition, regardless of whether there is a round in the chamber.

On the page immediately preceding, the military judge had instructed the members that an essential element of aggravated assault was that the weapon was used in a manner likely to produce death or grievous bodily harm. Thus, his instructions skirted the basic definition of a dangerous weapon, as set forth in the Manual for Courts–Martial, United States, 1984, Part IV, paragraph 54c(4)(a)(i), to wit:

A weapon is dangerous when used in a manner likely to produce death or grievous bodily harm.

Without this key definition, the members were almost certain to misinterpret the previous instructions as meaning that a loaded gun was, *per se*, a dangerous weapon, whether or not it had, in fact, been used in a manner likely to produce death or grievous bodily harm; hence, there would be no inconsistency in their minds in returning a finding of simple assault by a dangerous weapon.

We now return to the question of how the members likely found that an assault was committed. Had the specification been drafted initially to conform to what we believe was the members' view of the evidence, the operative language would probably have read something like this:

... did ... commit an assault on Michelle Cieslinski by drawing and display-

ing a dangerous weapon, to wit: a loaded .45 caliber pistol.

Such a specification would have given rise to a highly specialized application of legal principles not involved in the majority of assault cases. *See* 6 *Am.Jur.* 2d, Assault and Battery, § 31 (1963). Two of these principles are referred to in paragraph 54c(1)(c), Part IV, Manual for Courts–Martial, United States, 1984:

(i) *Mere preparation.* Preparation not amounting to an overt act, such as picking up a stone without any attempt or offer to throw it, does not constitute an assault.

(ii) *Circumstances negating intent to harm.* If the circumstances known to the person menaced clearly negate an intent to do bodily harm there is no assault.

The leading military case on the subject is *United States v. Hines,* 7 U.S.C.M.A. 75, 21 C.M.R. 201 (1956). The factors present in that case to justify the conclusion that more than mere preparation had occurred were the accused's drunken and emotional state, his order to the victims not to move, and his audible operation of the gun bolt so that it was in the firing position. As the court wrote:

Language in paragraph 207a, Manual for Courts–Martial, [1951], also supports the position that a gun need not be pointed at a victim, "Some other examples of acts which may constitute an assault are ... drawing a pistol from a holster or pocket *with an actual or apparent (to the person assailed) intent to use it.*" Here the carbine had been placed in a firing position and the accused's sharp command not to move indicated a willingness to use the weapon. Working the bolt of a loaded weapon so that it is ready for instant firing, coupled with a statement indicating a present intent to use the weapon, certainly is more than mere preparation.

(Emphasis supplied.)

We believe that the military judge's instructions were quite adequate for the offense as alleged, but, had the defense been placed on notice that the appellant might be found guilty on the theory of mere display of the weapon, they would have been forewarned to focus their argument on the abundance of evidence negating even an apparent intent to use the gun as a weapon, and to request instructions on mere preparation tailored to mere display, without pointing or cocking, of a firearm, unaccompanied by any verbal threats to use it.

Of course, we can only surmise the true finding of the members, because they were not called upon at trial to substitute any words for the excepted words so as to indicate the manner of the assault found, but we perceive a reasonable likelihood that the appellant was prejudiced by being found guilty of an assault committed in a manner significantly different from the one alleged. Not only are we unable to say that the members, if fully instructed on the concept of mere preparation versus' an overt act, would have found the appellant guilty of this offense, but we ourselves entertain a reasonable doubt that an actual assault took place, at least if the appellant did no more than the members apparently found that he did, considering the relationship of the parties, the absence of significant provocation, the willingness of the appellant to let Michelle Cieslinski push his arm aside, her own testimony about her reaction to the display of the pistol, and her failure to report the incident. Accordingly, we set aside the finding of guilty of Specification 2 of Additional Charge I and dismiss that specification. The remaining findings of guilty are affirmed.

■ Reassessing the sentence in accordance with *United States v. Sales,* 22 M.J. 305 (C.M.A.1986), we note the following:

First, the remaining offenses are serious, and the choking incident, as shown by the evidence, is particularly repugnant and, in our opinion, reflects an abusive personality, ill-suited for the Marine Corps and especially ill-suited for a military police battalion.

Second, although we deem the appellant not guilty of the assault with the pistol, the evidence of his overall conduct on guard

duty is, nevertheless, before us as part of the record. Such evidence, showing both improper performance of guard duty and imprudent handling of a weapon of the sort that all too often has unintended but tragic consequences, together with the balance of the record, casts further doubt on whether or not the appellant possesses the judgment or maturity required of a good Marine.

Third, the appellate defense counsel invites our attention to the appellant's desire to remain in the service, as expressed in his unsworn statement. We have noted not only that but also an "allied paper" consisting of a Request for Restoration/Clemency (NAVSO 5815/2), dated 29 March 1989, addressed to the Naval Clemency and Parole Board, in which the appellant indicates that he does not desire restoration to duty but does desire a discharge upgrade. In accordance with *United States v. Peoples,* 29 M.J. 426 (C.M.A.1990), we have excluded this "allied paper" from our consideration of what sentence the appellant's court-martial would have adjudged, absent a conviction on Specification 2 of Additional Charge I.

On the whole record, we affirm only so much of the sentence, as approved on review below, as provides for reduction to pay grade E–1, forfeiture of $466.00 pay per month for four months, confinement for four months, and a bad-conduct discharge.

Chief Judge BYRNE and Judge STRICKLAND concur.