UNITED STATES, Appellee

v.

BERYL F. RUTHERFORD, Private E-2, U. S. Army, Appellant

4 USCMA 461, 16 CMR 35

CAPT William C. Irby, Jr., U. S. Army, and 1ST LT Joseph B. Axelman, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and MAJ Irvin M. Kent, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was convicted by general court-martial of two specifications, each alleging the communication of a threat to kill his commanding officer, in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for one year. Intermediate appellate tribunals have affirmed the findings and sentence. We granted the accused's petition for review to determine three issues:

 1. Whether communicating a threat constitutes a violation of Article 134.

 2. Whether communicating a threat to a person other than the person threatened constitutes the offense.

 3. Whether the evidence is legally sufficient to sustain the conviction.

The evidence in this case is painfully clear. It shows that during the night of December 14–15, 1952, the accused was placed in the hold-over cell of the guardhouse at Fort Kobbe, Canal Zone. In the morning when two soldiers arrived to return him to his organization, which was then in the field on maneuvers, the accused announced that he did not want to return to his unit. Pressed for the reasons for this, he said to the confinement officer, "Sir, let me stay here . . . . If I go back to my unit, I will kill him." He then indicated that he was referring to one Lieutenant Driscoll, his company commander. At the time of these statements, the accused was in a highly excited state and was described as bordering on crying.

On December 16, 1952, the accused appeared before Major Radzwick, for trial by summary court upon charges involving an unauthorized absence. As the nature of the proceedings was being explained to him, the accused reiterated his request to be confined, stating he was going to kill his commanding officer to whom he attributed all his difficulties.

Lieutenant Driscoll, the object of the accused's statements, was not present when the alleged threats were made, but he was advised of them by the persons before whom they were uttered.

The first issue is disposed of by our opinion in United States v. Holiday, 4 USCMA 454, 16 CMR 28, decided this date.

As set out in that case, the purpose of imposing a penalty upon the communication of threats in the military service is to prevent the ultimate harm which such threats foretell. Consequently, once it clearly appears that a person subject to the Code has announced an avowed present determination or intent to injure presently or in the future, the offense is complete. There is no necessity for establishing, as an essential element of the offense, that the accused communicated this determination directly to the person threatened. See United States v. Metzdorf, 252 Fed 933 (Mont).

A threat is an avowed present determination or intent to injure presently or in the future. United States v. Metzdorf, supra; United States v. Sturmer, 1 USCMA 17, 1 CMR 17; United States v. Holiday, supra. A careful analysis of the evidence in this case definitely establishes that no threat was made by

462

the accused. All the witnesses agree that when the statements were made, the accused was in a highly emotional, almost irrational, state. And yet, he appreciated the possibility that he would injure his commanding officer unless forcibly restrained within a confinement facility. Each of his utterances was designed to convey this fear to his listeners. Rather than demonstrating "an avowed present determination or intent to injure presently or in the future," the accused's words and actions reveal a fixed purpose to avert such a result. Although such violent actions are hardly commendable, they do not constitute the offense of communicating a threat, for here no threat was made.

The decision of the board of review is reversed, and the charge and specifications are dismissed.

BROSMAN, Judge (concurring in the result):

I agree with the result reached by the author of the principal opinion.

Conceding arguendo that communicating a threat constitutes an offense under Article 134—which I am unwilling to grant otherwise—I am sure as the Chief Judge is that the evidence here does not make out that crime.

My views on the question of the existence of such an offense, as such, are set out in a separate opinion in United States v. Holiday, decided this day.

LATIMER, Judge (concurring in part and dissenting in part):

I concur in the holding that communicating a threat is a violation of Article 134, Uniform Code of Military Justice, 50 USC § 728, for the reasons set forth by the Chief Judge in United States v. Holiday, 4 USCMA 454, 16 CMR 28.

I dissent from the holding that the evidence is insufficient to support the finding. To make a fair appraisal of the evidentiary sufficiency, it is necessary that consideration be given to the background of accused's mental attitude toward his superiors. First, I should

state that because of his bizarre behavior, he was given a psychiatric examination and found sane, so I need not burden the reader with developing any issues concerning his mental deficiencies or his anti-social complex. He apparently had little respect for those in command as his threats were not limited to one commissioned officer. For his purposes a first sergeant or any member of his company was fair game. However, he had a bitter resentment toward his commanding officer, Lieutenant Driscoll, because he believed that officer was the cause of all his service troubles.

The first incident in this unfortunate drama, of which we may take notice, happened on December 12, 1952. On that occasion accused, who was emotionally upset, strolled into the office of the military police administrator, asked to be locked up, and threatened members of his organization. During this tirade, he stated he would do bodily harm to his first sergeant and his commanding officer if he was sent back to his unit. He was calmed down by the administrator and he regained his composure. Sometime thereafter he left the area, and on the night of December 14, 1952, he was apprehended and confined in the post stockade for being absent without leave. At approximately 8:10 a.m. on December 15, 1952, two enlisted men reported to the guardhouse for the purpose of returning him to his unit. Prior to this time, the officer in charge had received information from the accused that he did not want to return to the company. On the contrary, his desire was to remain in the stockade. The officer called the regimental adjutant for instructions and, based on those, he informed the accused that he was to return to his unit. These are the statements made and the replies given when the accused was ordered to leave with the guards:

"Q. And at that time did the accused make any statements to you?
A. Yes sir.
"Q. And what were those statements?
A. He told me he wanted to stay in the guardhouse, in the cell block, he didn't want to go back to his unit.

**463**

I ordered him to go back to his unit, and he says, 'Sir, let me stay here. I want to stay here. If I go back to my unit, I will kill him, I will kill him'. So I or another sergeant there asked the man, 'Who would you kill', and he said, 'Lieutenant Driscoll, the company commander'.

"Q. And then what occurred after that?

A. Well, after he says that, I ordered the man again, and he says, 'Let me stay here. I want to stay here locked up', but I didn't pay much attention to that so I ordered him again and he says, 'You heard me. I am making a threat'."

After the foregoing colloquy, the accused walked back to his cell block and a sergeant described his behavior as follows:

"He walked back in, back out, with his fists clenched up and said, 'If they send me back to the company, I am going to kill my company commander'."

The next event which was made the basis of a specification arose out of the following situation. On the 16th day of December 1952, the accused was taken before a summary court officer to answer to the charge of being absent without leave. The officer described his conduct and statements in the following language:

"Rutherford appeared before me. I started to explain his rights to him and he never allowed me to finish. He would interrupt and take on the conversation, saying, 'You had better lock me up. I am going to kill my company commander, Lieutenant Driscoll'. Sometimes he would say he was going to kill Lieutenant Driscoll without adding 'lock me up'. Sometimes he would say he was going to shoot him. Sometimes he was going to kill him. I asked him why he wanted to kill Lieutenant Driscoll and he then said that Lieutenant Driscoll was the cause of all his troubles and I asked him to elaborate on the thing, and he tried to give me the impression that he was a good soldier or could be a good

soldier and could have been a sergeant had it not been for Lieutenant Driscoll. . . ."

The officer who was the executive officer of the battalion was so concerned by the threatening attitude and seriousness of the accused in expressing his intent to kill that he notified regimental headquarters and the officer concerned, and the accused was kept under surveillance.

The Court's opinion defines a threat as an avowed present determination or intent to injure presently or in the future. My associates conclude the accused's words and actions reveal a fixed purpose to avert inflicting bodily harm on the officer and, therefore, no intent to injure. I reach a contrary conclusion. I gather from the quoted portions of the record and from the accused's pattern of behavior that there was an avowed present determination to inflict bodily harm on the commanding officer, and that unless the military complied with his demand he would carry out his expressed intent to kill. On three separate occasions the accused made it clear that if he was returned to his unit a killing would occur and the lieutenant was the prime target. Of course, the military authorities could have prevented the execution of the threats by yielding to the demands of the accused, but they had then extended over a four-day period, they were not being diminished, and apparently they were used on each occasion when the accused visualized a return to duty. Fortunately, subsequent events proved they were idle, but that does not change their character. My associates do not say so but I suppose, under the rule announced, that each time the authorities attempted to return the accused to duty they could either endanger the company commander or meet the accused's demand. At the very least they suggest an original and unique method of avoiding punishment by forcing military authorities to recognize the conditions advanced by the accused.

In United States v. Holiday, supra, we affirmed a similar conviction when the enlisted man stated: "If I'm not walking fast enough for you, don't push

me or I'll knock your . . . teeth down your throat." Here we reverse when the statement is "You had better lock me up. I am going to kill my company commander." The execution of both are conditioned on one act being performed and, as I compare the two, this one appears to be the more serious. Furthermore, in this case we do not have to search the record too carefully to determine whether the accused was merely seeking asylum or was uttering an open and notorious threat. He furnishes us with a quick and ready answer to that question. In what appears to have been an unequivocal expression, he notified his hearers that he was threatening the officer.