UNITED STATES, Appellee

v

HERBERT H. HILL, II, Airman U. S. Air Force, Appellant

No. 27,096

December 14, 1973

*Lieutenant Colonel James LaBar* argued the cause for Appellant, Accused. With him on the brief was *Colonel George M. Wilson.*

*Colonel C. F. Bennett* argued the cause for Appellee, United States.

## OPINION OF THE COURT

DARDEN, Chief Judge:

The issue before us in this case is whether the evidence is sufficient to support findings of guilty of a charge that the accused communicated a threat to Airman First Class Rebecca Dawn Hewitt.

The evidence is not in conflict. The accused and Miss Hewitt were both members of the United States Air Force, stationed at Carswell Air Force Base, Texas. At the time of the incident, they had been dating seriously for about 6 months. Miss Hewitt felt that the accused loved her and knew that "I cared very much for him." They seriously con-

sidered marriage and talked of visiting the accused's mother.

In January 1972, Miss Hewitt became annoyed at the accused "because I felt if I wanted to see somebody else, he should let me." On the evening of January 26, she refused to date the accused and made a date with Airman First Class Randall J. Larsen.

Airman Larsen accompanied Miss Hewitt to the service club. The accused approached them there and said, " 'Becky, let's go talk.' " Miss Hewitt agreed and went with the accused to the club's TV room. Miss Hewitt sat down and the accused began to talk to her about her date with Larsen that evening. The accused thought it was unfair for her to date Larsen after refusing to go out with him. Their exchanges became somewhat heated and the accused "told me not to make him mad because he had never hit me in public but he would if I did make him mad."

Miss Hewitt did not attempt to leave, since she knew the accused "was very serious about what he had to say." Finally, they were asked to leave the club because it was closing. Both the accused and Airman Larsen accompanied Miss Hewitt back to her quarters. The accused entered the barracks, and Miss Hewitt stayed outside with Larsen. She informed Larsen that she was frightened. According to her testimony, this was done to arouse Larsen's "protective instincts."

After Larsen departed, Miss Hewitt entered her barracks and continued to converse with the accused "about our relationship, how we felt towards each other, about marriage." At about 3:00 a.m., she kissed the accused goodnight and he left. Although Miss Hewitt felt the problem "was between us," Airman Larsen reported the "threat" to agents of the Office of Special Investigations on the following morning. Miss Hewitt was summoned to their office. She testified that "they talked to me quite awhile until I made a statement."

Miss Hewitt summed up her attitude towards the accused's "threat" by testifying:

He is not the kind of person to just blow up, strike out or anything like that. When he gets upset, he is more verbal about it, that way.

Miss Hewitt sought unsuccessfully to see the accused while he was in pretrial confinement; she talked with him in defiance of her squadron commander's instructions after he was released from confinement; and she asked the pretrial investigating officer "if I could please see Hill because we weren't allowed to see each other."

■ To establish the accused's guilt, the Government relies only on his statement that he would strike Miss Hewitt if she angered him. But in the abstract, words may have little meaning. In threat cases, the circumstances and the understanding of the parties provide meaning to, and affect the legal consequences of, their statements. United States v Shropshire, 20 USCMA 374, 43 CMR 214 (1971). While the existence of an actual intent to injure is not an element of the offense, the Court has stated:

[T]he declarant's true intention, the understanding of the persons to whom the statement is communicated and the surrounding circumstances may so belie or contradict the language of the declaration as to reveal it to be a mere jest or idle banter.

United States v Gilluly, 13 USCMA 458, 461, 32 CMR 458, 461 (1963).

■ With these precedents, we reject the Government's argument that evidence of the words spoken by the accused is alone sufficient to establish his guilt. Communication of a threat is punishable only because, under certain circumstances, it may amount to conduct *directly* prejudicial to good order and discipline in the armed forces or tending *directly* to reflect discredit upon the armed forces. United States v Rutherford, 4 USCMA 461, 16 CMR 35 (1954); United States v Holiday, 4 USCMA 454, 16 CMR 28 (1954). An essential element of the offense is that the accused's conduct must be prejudicial to good order and discipline or discrediting to the service. United States v Lawrence, 8

USCMA 732, 25 CMR 236 (1958); United States v Williams, 8 USCMA 325, 24 CMR 135 (1957). Proof of this element is what we find lacking in the instant case.

■ Mindful of our duty in reviewing sufficiency to view the evidence from the standpoint most favorable to the Government, we find nothing in the accused's declaration, in the circumstances of this case, that tends to have any direct impact on military order and discipline or to reflect discredit directly on the armed forces. Miss Hewitt conceded the existence of a romantic relationship between her and the accused. She went voluntarily with him to the TV room and talked with him for more than an hour on the state of their friendship. She not only permitted the accused to accompany her back to her quarters but she there engaged him in another long discussion that ended at 3:00 a.m. with a kiss. Although she informed Larsen that she was frightened, she testified that her purpose was to appeal to his protective instincts. She had no intention of reporting the incident and considered it to be personal. Even when summoned by the Office of Special Investigations, she was reluctant to make a statement and did so only after "they talked to me quite awhile."

Framed in this way, the accused's statement did not constitute the sort of threat punishable under Article 134, Uniform Code of Military Justice, 10 USC § 934. Rather, the entire incident strikes us as having been a lovers' quarrel, perhaps aggravated by Miss Hewitt's playing one suitor against another. The crucial point is the effect of the accused's behavior on the service. United States v Ragan, 14 USCMA 119, 33 CMR 331 (1963). From the accused's language it may be possible to postulate some remote or indirect effect on good order, but that is insufficient to establish a violation of Article 134, UCMJ, 10 USC § 934. United States v Sadinsky, 14 USCMA 563, 34 CMR 343 (1964).

To constitute an offense, the accused's statement would have to be "misconduct which is directly and palpably—as distinguished from indirectly and remotely —prejudicial to good order and discipline." United States v Holiday, supra at 456, 16 CMR at 30. In this case, we find no basis for the fact finder to conclude that the statement had that character. Accordingly, the evidence is insufficient in law to support the findings of guilty of communicating a threat.

The decision of the U. S. Air Force Court of Military Review is reversed. The findings of guilty of Specification 4 of Charge II and the sentence are set aside and the specification is ordered dismissed. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing on the sentence is ordered.

Judges QUINN and DUNCAN concur.