*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

————————

### UNITED STATES
Appellee

**v.**

### Eric L. RAPERT, Specialist
United States Army, Appellant

**No. 15-0476**

Crim. App. No. 20130309

Argued October 21, 2015—Decided March 18, 2016

Military Judges: David L. Conn and Craig S. Denney

For Appellant: *Captain Katherine L. DePaul* (argued)*; Lieutenant Colonel Jonathan F. Potter and Captain Heather L. Tregle* (on brief)*; Lieutenant Colonel Charles D. Lozano, Major Aaron R. Inkenbrandt, Major Christopher D. Coleman, and Captain Ryan T. Yoder*.

For Appellee: *Captain Anne C. Hsieh* (argued)*; Colonel Mark H. Sydenham, Major Daniel D. Derner, and Major A. G. Courie III* (on brief)*; Major Steven J. Collins*.

Amicus Curiae for Appellant: *Hardev Chhokar* (law student) (argued)*; Dana Wallace* (law student) and *Stephen L Braga,* Esq. (supervising attorney) (on brief) – University of Virginia School of Law.

Judge OHLSON delivered the opinion of the Court, in which Chief Judge ERDMANN and Senior Judge LAMBERTH joined. Judge STUCKY filed a separate dissenting opinion, in which Judge RYAN joined.

————————

Judge OHLSON delivered the opinion of the Court.[1]

Appellant was charged with communicating a threat against the President of the United States in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2012). Contrary to his pleas, Appellant was

---

[1] Senior Judge Royce C. Lamberth, of the United States District Court for the District of Columbia, sat by designation, pursuant to Article 142(f), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 942(f) (2012).

convicted by a military judge sitting as a special court-martial. We granted review to determine whether the military judge's interpretation of what constitutes communicating a threat under Article 134, UCMJ, conflicts with the Supreme Court's recent holding in *Elonis v. United States*, 135 S. Ct. 2001 (2015), and, if not, whether Appellant's conviction was nonetheless legally insufficient in light of the First Amendment.[2] We answer both questions in the negative. First, the requirement under Article 134, UCMJ, that the communication be "wrongful" separates lawful conduct from unlawful conduct and thereby distinguishes the offense at bar from the one at issue in *Elonis*. Second, even assuming Appellant's speech was within the ambit of the First Amendment, the unique nature of Article 134, UCMJ, and the interests it seeks to protect justify the criminal prohibition placed on the statements made by Appellant against the President. As a result, the decision below is affirmed.

## I. BACKGROUND

On Tuesday, November 6, 2012, Appellant and his wife went to the home of their friends, the Kilburns, in order to watch the results of the presidential election. As the election coverage unfolded on television, Appellant became angry when he realized that President Obama would be reelected for a second term.

After the election was officially called in favor of the President, Appellant stepped outside with his wife and Mr. Kilburn to smoke a cigarette. Also outside were the Kilburns' neighbors. According to Mr. Kilburn's testimony at trial, Appellant stated the following:

> I can't believe that n[****]r won this election. He hasn't done anything in the 4 years prior and I don't feel that he's going to do anything in the 4

---

[2] Oral argument in this case was heard at the University of Virginia School of Law, Charlottesville, Virginia, as part of the Court's "Project Outreach." *See United States v. Mahoney*, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

years upcoming. I don't think I can serve in the military another 4 years under his control. I might have to go back home in this upcoming training session that we're going to do for the winter and break out my KKK robe that was handed down to me by my grandfather and go put one order up and make it my last order to kill the President.[3]

Mr. Kilburn was shocked by Appellant's statements and took them seriously. According to Mr. Kilburn, Appellant previously had indicated that his family had ties to the Ku Klux Klan. Ultimately, Mr. Kilburn told his wife, Specialist Kilburn, about the statements and she reported them to her chain of command.

The Criminal Investigation Division notified the Secret Service about Appellant's alleged statements and an investigation was opened. During trial, a Secret Service agent testified that Appellant admitted that while at the Kilburns' house on election night 2012, he "had made several statements claiming to be a member of the KKK, and that he was planning on going back to Missouri and giving an order to lynch President Obama, hang him from a tree, and cut his throat." However, Appellant also told the Secret Service that his statements that night were "completely me[a]nt as harmless jokes" and that he "didn't mean anything by those statements." Ultimately, the inquiry uncovered no evidence that Appellant or his family had any connection to the Ku Klux Klan.

Appellant was tried by a military judge sitting as a special court-martial and found guilty of communicating a threat against the President of the United States in violation of Article 134, UCMJ.[4] The specification for which Appellant was found guilty reads as follows:

---

[3] Although Mr. Kilburn first testified that Appellant ended his statement with the words "the President," he subsequently clarified that Appellant actually used the term "n[****]r" instead.

[4] Appellant also was convicted of violating a lawful general order, engaging in lewd acts in the physical presence of two females under sixteen years of age, and unlawfully striking a child

> Specialist Eric L. Rapert, U.S. Army, did, …
> wrongfully communicate to Keith Kilburn a threat
> to wit: "When I go back to Missouri for training
> soon, I am going to pull my robe out and give one
> order to be carried out to kill that n[****]r. I am not
> going to serve under that n[****]r and I will ask for
> this one order to be carried out by me[]," or words
> to that effect, such communication referring to the
> President of the United States of America, and that
> said conduct was to the prejudice of good order and
> discipline in the armed forces and was of a nature
> to bring discredit upon the armed forces.[5]

The military judge sentenced Appellant to confinement for six months, a reduction to E-1, and a bad-conduct discharge. The convening authority approved the sentence and the United States Army Court of Criminal Appeals summarily affirmed. We subsequently granted review of Appellant's petition on the following specified issue:

> Whether the finding of guilty for Charge I and its specification for communicating a threat is legally insufficient because the comments are constitutionally protected and do not constitute a threat under the totality of the circumstances and in light of the Supreme Court's decision in *Elonis v. United States*, 575 U.S. __, 135 S. Ct. 2001 (2015).

## II. DISCUSSION

As specified by the President, communicating a threat under Article 134, UCMJ, requires the Government to demonstrate four elements beyond a reasonable doubt:

> (1) That the accused communicated certain language expressing a present determination or intent to wrongfully injure the person, property, or reputation of another person, presently or in the future;

---

under sixteen years of age in violation of Articles 92, 120b, and 128, UCMJ, 10 U.S.C. §§ 892, 920(b), 928 (2012).

[5] This version of Appellant's statement is not identical to the version testified to by Mr. Kilburn, but we note that the specification properly employs the proviso "or words to that effect."

(2)   That the communication was made known to that person or to a third person;

(3)   That the communication was wrongful; and

(4)   That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

*Manual for Courts-Martial, United States* pt. IV, para. 110.b (2012 ed.) (*MCM*); *see also United States v. Brown*, 65 M.J. 227, 229 (C.A.A.F. 2007).

Appellant argues that his conviction is premised on legally insufficient evidence for two reasons. First, Appellant focuses on this Court's long history of identifying a "threat" through an objective lens. He avers that if a "threat" is alone defined by what a reasonable listener would understand to be a threat—with no consideration of the accused's state of mind when making the communication—then this approach runs counter to the traditional rule that mens rea is an essential element of every crime.[6] Moreover, Appellant argues that under such a legal construct, the question of criminality is improperly reduced to a mere question of negligence, which is the very standard that was recently rejected by the Supreme Court in *Elonis*, 135 S. Ct. 2001. Second, Appellant urges that his statements are within the

---

[6] "Mens rea" is Latin for "guilty mind" and refers to the state of mind an accused had when committing a crime. *See Black's Law Dictionary* 1134–35 (10th ed. 2014). At common law, in order to secure a conviction the prosecution was required to prove two essential elements: the actus reus (or "guilty act") and the mens rea of the accused. *See United States v. Apfelbaum*, 445 U.S. 115, 131 (1980) ("In the criminal law, both a culpable *mens rea* and a criminal *actus reus* are generally required for an offense to occur."). As the Supreme Court recently reiterated in *Elonis*, this concept reflects the basic principle that "wrongdoing must be conscious to be criminal" and that a defendant must be "blameworthy in mind" before he can be found guilty. 135 S. Ct. at 2009 (citations omitted) (internal quotation marks omitted). Thus, mens rea is "the rule of, rather than the exception to, … Anglo-American criminal jurisprudence." *United States v. United States Gypsum Co.*, 438 U.S. 422, 436 (1978) (citation omitted) (internal quotation marks omitted).

scope of the First Amendment and thus cannot provide the basis for his conviction. For the reasons discussed below, we disagree both with Appellant's premises and with his conclusions.

## A. *ELONIS* AND COMMUNICATING A THREAT

In *Elonis*, a defendant who had made a number of emotionally charged "posts" on social media was convicted under 18 U.S.C. § 875(c)—a statute criminalizing the interstate communication of threats.[7] The defendant argued that the prevailing interpretation of 18 U.S.C. § 875(c) improperly relieved the Government of a need to prove mens rea,[8] and the Supreme Court agreed. "The fact that [a] statute does not specify any required mental state," the Supreme Court held, "does not mean that none exists." *Elonis*, 135 S. Ct. at 2009. "Federal criminal liability generally does not turn solely on the results of an act without considering the defendant's mental state." *Id.* at 2012. Further, the Court stated, "federal criminal statutes that are silent on the required mental state [must be read to require] only that *mens rea* which is necessary to separate wrongful conduct from otherwise lawful conduct." *Id.* at 2010 (internal quotation marks omitted) (quoting *Carter v. United States*, 530 U.S. 255, 269 (2000)). Absent this requirement, liability would "turn on whether a 'reasonable person' regards the communication as a threat," which would "'reduce culpability on the all-important element of the crime to [mere] negligence.'" *Id.* at 2011 (noting further that the Supreme Court has "'long been reluctant to infer that a negligence standard was intended in criminal statutes'") (citation omitted). On this basis, the Supreme Court reversed the defendant's conviction and remanded for a new trial. *Id.* at 2013.

---

[7] 18 U.S.C. § 875(c) criminalizes "transmit[ting] in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another." *Elonis*, 135 S. Ct. at 2007.

[8] At the time, nine federal courts of appeals held that negligence alone was sufficient to establish liability under the statute. *Elonis,* 135 S. Ct. at 2013.

In light of the Supreme Court's holding in *Elonis*, and consistent with the assigned issue in this case, we first are tasked with determining whether the Government in the instant case was only required to prove negligence in order to secure a conviction for communicating a threat under Article 134, UCMJ. This is an issue of statutory construction, which we review de novo. *United States v. Lopez de Victoria*, 66 M.J. 67, 73 (C.A.A.F. 2008).

Simply stated, the infirmities found in 18 U.S.C. § 875(c) are not replicated in Article 134, UCMJ. As explained in further detail below, both our precedent and basic principles of statutory construction demonstrate that communicating a threat under the UCMJ does not predicate criminal liability on mere negligence alone, but instead requires the Government to also prove a subjective element, i.e., the accused's mens rea. This subjective element, which requires the communication to be "wrongful," prevents the criminalization of otherwise innocent conduct and places the case at bar beyond the reach of *Elonis*.

### i. The Objective Prong of Communicating a Threat Under Article 134, UCMJ

We have long embraced an objective approach in determining whether a communication constitutes a "threat" under the first element of Article 134, UCMJ. The general definition of this term in the military justice system can be traced to a 1918 federal district court opinion. *See United States v. Sturmer*, 1 C.M.A. 17, 18, 1 C.M.R. 17, 18 (1951) ("'A threat is an avowed present determination or intent to injure presently *or in the future*.'" (alteration in original) (quoting *United States v. Metzdorf*, 252 F. 933, 938 (D. Mont. 1918))); *accord United States v. Davis*, 6 C.M.A. 34, 36, 19 C.M.R. 160, 162 (1955) (acknowledging *Metzdorf* as the source of the definition). This understanding of a "threat" progressively suffused our holdings, *compare United States v. Holiday*, 4 C.M.A. 454, 459, 16 C.M.R. 28, 33 (1954) (referencing *Metzdorf* in its analysis of communicating a threat), *with United States v. Phillips*, 42 M.J. 127, 129 (C.A.A.F. 1995) (same), and is reflected in the current language of the first element of communicating a threat

under Article 134, UCMJ.[9] Thus, when analyzing whether a communication constituted a threat under this first element, we have held that "the existence of a threat should be evaluated from the point of view of a reasonable [person]." *Phillips*, 42 M.J. at 130.

Importantly, however, this objective approach to the notion of a "threat" refers only to the *first* element of the offense and not to the *third* element. *See, e.g., United States v. Humphrys*, 7 C.M.A. 306, 307, 22 C.M.R. 96, 97 (1956) ("The point which seems to need emphasis [in this case] is that proof of a declaration of intent is different from proof of the intent itself. To establish the [declaration of a] threat [under the first element of Article 134], the prosecution must show that the declaration was made" and not "that the accused actually entertained the stated intention."); *Phillips*, 42 M.J. at 129 (noting that the issue on review was "whether a rational factfinder … could find … that appellant's language constituted a threat as defined [in the first prong of the offense]"). Absent this distinction between the first and third elements of the offense, our recognition that a speaker's "true intention" is significant—the third element—would conflict with our coordinate (and often simultaneous) suggestion that the "intent locked in the mind of the declarant" does not matter—the first element. *See, e.g., United States v. Gilluly*, 13 C.M.A. 458, 461, 32 C.M.R. 458, 461 (1963) (acknowledging both). These apparently contradictory propositions exist in harmony because they speak to the requirements of *two different elements* of a *single* offense. *See United States v. Shropshire*, 20 C.M.A. 374, 375, 43 C.M.R. 214, 215 (1971) ("[P]roof of a declaration of intent is different from proof of the intent itself."); *accord Humphreys*, 7 C.M.A. at 308, 22 C.M.R. at 98. Accordingly, it is only with respect to identifying a "declaration of intent"— that is, the first element of this offense regarding whether

---

[9] As noted above, the first element of communicating a threat under Article 134, UCMJ, is as follows: "That the accused communicated certain language expressing a present determination or intent to wrongfully injure the person, property, or reputation of another person, presently or in the future." *MCM* pt. IV, para. 110.b.(1).

the communication was indeed threatening—that subjectivity is of no bearing and the objective determination of whether a communication constituted a threat prevails. In his argument, Appellant ignores the wrongfulness requirement of the third element, as discussed below.

### ii. The Subjective Prong of Communicating a Threat Under Article 134, UCMJ

The third element of this offense, which requires that a threat be "wrongful," is properly understood to reference the accused's subjective intent. "The wrongfulness of [an] act obviously relates to *mens rea* (not elsewhere specified amongst the elements) and lack of a defense, such as excuse or justification." *United States v. King*, 34 M.J. 95, 97 (C.M.A. 1992); *accord United States v. Thomas*, 65 M.J. 132, 134 (C.A.A.F. 2007) (citation omitted) ("The word 'wrongful,' like the words 'willful,' 'malicious,' 'fraudulent,' etc., when used in criminal statutes, implies a perverted evil mind in the doer of the act."). It is important to note that a contrary understanding would render the third element superfluous. *See King,* 34 M.J. at 97 (noting in the context of adultery that "the wrongfulness of the intercourse is independent, not redundant, of marital status" and must itself be proven as a separate element).[10] In regard to an accused's subjective intent, both the *MCM* and our jurisprudence reflect the fact that "a declaration made under circumstances which reveal it to be in jest or for an innocent or legitimate purpose … does not constitute [communicating a threat under Article 134]." *MCM* pt. IV, para. 110.c; *accord Gilluly*, 13 C.M.A. at 461, 32 C.M.R. at 461 ("[A] declarant's true intention … and the surrounding circumstances may so belie or contradict the language of the declaration as to reveal it to be a mere jest or idle banter."); *Davis*, 6 C.M.A. at 37, 19 C.M.R. at 163 (suggesting the defense of "jest" can be available notwithstanding the explicitly threatening language used in the contested communication).

---

[10] Importantly, however, intent in this context is not akin to the speaker's subjective intent to *execute* the threat; instead, this aspect of intent relates to whether the speaker intended his or her words *to be understood as sincere.*

As can be seen then, the proper legal framework for analyzing whether an individual communicated a threat as proscribed by Article 134, UCMJ, consists of both an objective prong and a subjective prong. Indeed, for clarity's sake, the elements of this offense could be considered to read as follows:

> (1) That the accused communicated certain language [that a reasonable person would understand as] expressing a present determination or intent to wrongfully injure the person, property, or reputation of another person, presently or in the future;
> (2) That the communication was made known to that person or to a third person;
> (3) That the communication was wrongful [in that the speaker intended the statements as something other than a joke or idle banter, or intended the statements to serve something other than an innocent or legitimate purpose]; and
> (4) That … the conduct of the accused was to the prejudice of good order and discipline … or … of a nature to bring discredit upon the armed forces.

*MCM* pt. IV, para. 110.b.

The *MCM*'s requirement that the Government prove that an accused's statement was wrongful because it was not made in jest or as idle banter, or for an innocent or legitimate purpose, prevents the criminalization of otherwise "innocent conduct," and thus requires the Government to prove the accused's mens rea rather than base a conviction on mere negligence. It is thereby evident that the offense of communicating a threat under Article 134, UCMJ, is substantively different than the offense at issue in *Elonis*. *Cf.* 135 S. Ct. at 2010–12.

## B. THE MILITARY JUDGE'S UNDERSTANDING OF THE LAW

Having laid out the proper analytical framework to be used in determining whether the actions of an accused constitute communicating a threat under Article 134, UCMJ, we now turn our attention to deciding whether the

military judge in the instant case correctly employed this framework when convicting Appellant of the charged offense. We conclude that he did.

We first start with the proposition that "[m]ilitary judges are presumed to know the law and to follow it absent clear evidence to the contrary."[11] *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007). We then note that in the record before us we find no clear evidence that the military judge embraced a view of the law that conflicts with our holding today. In fact, each of the admittedly few insights into the military judge's understanding of the law indicates that he properly considered both the objective and subjective prongs of the offense in determining that Appellant was guilty of communicating a threat under Article 134, UCMJ.

Take, for example, the questioning of Agent Taylor (AT) by the military judge (MJ):

> MJ:    Agent Taylor,… during cross-examination counsel just asked you something to the effect that [Appellant] said he wasn't serious. Could you elaborate on that? What, if anything, did the accused tell you about why he made the statements?
> AT:    He said he was upset. I can't remember the exact words here. It was something to the lines of

---

[11] The dissent seems to be of the mind that because we have not yet had the opportunity to rule directly on what wrongfulness means in the context of communicating a threat, there is simply no "law" for the military judge to "follow" beyond that referencing negligence as the proper standard—albeit in the context of the *first element,* as we have already described at length. *Rapert,* 75 M.J. __, __ (6) (Stucky, J., joined by Ryan, J., dissenting) ("[W]e must presume that the military judge applied a negligence standard …."). Were this actually the case, a military judge could rarely enjoy affirmance when ruling on a matter of technical first impression. However, the presumption cited above assumes that a military judge *reached the correct answer*—consistent with our determination on appeal—absent clear evidence to the contrary. Thus, the fact that today's holding for the first time *expressly* defines wrongfulness has little effect on our ability to endorse the military judge's holding.

> he was venting, you know, that night, and that he
> didn't mean anything by those statements.
> MJ: Okay. Thank you. That's all the questions I
> have for the Court.

Although the response provided by the witness may be seen as weakening the Government's case, it is not the evidentiary weight of this response that is key to our current review; it is the nature of the military judge's inquiry that matters. The military judge's line of questioning correctly focused on Appellant's subjective intent. This inquiry thereby indicates that the military judge was properly evaluating Appellant's mens rea as he, the trier of fact, contemplated the wrongfulness element of communicating a threat.

Further, when trial counsel and defense counsel argued past one another with respect to intent while citing two cases—*United States v. Hall*[12] and *United States v. Humphrys*—the military judge requested and received from the parties copies of both decisions for "review during deliberations." Neither of these cases conflicts with our holding today, and there is no clear evidence in the record to conclude that the military judge misapplied the applicable law to the facts of the instant case. As a result, we must adhere to the presumption that "[m]ilitary judges … know … and … follow [the law]." *Erickson*, 65 M.J. at 225.

### C. APPLICABILITY OF THE FIRST AMENDMENT

Also at issue in this case is whether the First Amendment renders Appellant's conviction legally insufficient. This question requires that we initially consider whether "the speech involved … is … protected under the First Amendment." *United States v. Wilcox*, 66 M.J. 442, 447 (C.A.A.F. 2008). If so, our attention turns next to whether "the Government … [has] proved the elements of an Article 134, UCMJ, offense." *Id.* Finally, if the Government has successfully carried its burden under these elements, the Court may undertake to determine "whether the gravity of

---

[12] The record indicates that this opinion can be found at 52 M.J. 509, but no such case exists. We believe the case referenced was *United States v. Hall*, 52 M.J. 806 (N-M. Ct. Crim. App. 2000).

the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." *United States v. Priest*, 21 C.M.A. 564, 570, 45 C.M.R. 338, 344 (1972) (internal quotation marks omitted) (citation omitted); *see also Wilcox*, 66 M.J. at 449 (establishing this question as a tertiary consideration). This, we have held, "'is a question of proximity and degree.'" *Priest*, 21 C.M.A. at 570, 45 C.M.R. at 344 (citation omitted).

Upon considering these issues, we conclude that Appellant's arguments in this vein are without merit. Even assuming arguendo that Appellant's speech was within the ambit of the First Amendment's embrace,[13] the unique nature of Article 134, UCMJ, and the interests it seeks to protect justify the proscription of Appellant's speech in this case. First, contrary to Appellant's assertions, the Government proved a palpable connection between his speech and the military mission or environment. Second, the balance of interests in this case weighs heavily in favor of proscription.

### i. The Communication's Effect on the Military Mission or Environment

We first consider whether in the instant case the Government proved the existence of a direct and palpable connection between Appellant's speech and the military mission or environment. This connection is a necessary showing under Article 134, UCMJ. *Brown*, 45 M.J. at 396 ("'[O]ur national reluctance to inhibit free expression dictates that the connection between statements or publications involved and their effect on military discipline be closely examined.'" (quoting *Priest*, 21 C.M.A. at 569–70, 45 C.M.R. at 343–44)); *see also Wilcox*, 66 M.J. at 448. In practice, this connection is contextually oriented, *see United States v. Daniels*, 19 C.M.A. 529, 534–35, 42 C.M.R. 131, 136–37 (1970), and cannot be evidenced by speech that is "prejudicial only in a remote or indirect sense," *MCM* pt. IV,

---

[13] Traditionally, "threats of violence are outside the First Amendment." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992); *see also Watts v. United States*, 394 U.S. 705, 708 (1969); *United States v. Ogren*, 54 M.J. 481, 484 (C.A.A.F. 2001).

para. 60.c.(2)(a); *see also Wilcox*, 66 M.J. at 448–49. In conducting our review, we approach this question "'in the light most favorable to the prosecution.'" *Wilcox,* 66 M.J. at 446 (citation omitted).

The record clearly supports the conclusion that Appellant's speech had a direct and palpable effect on the military mission and environment. Speech such as that used by Appellant on Election Day 2012 regarding the President of the United States—who also serves as the Commander in Chief of the Armed Forces—unquestionably undermines the military's unique interest in ensuring obedience to the chain of command, and also undermines the military's unique responsibility to maintain an effective fighting force during a time of war. "[T]o accomplish its mission[,] the military must foster instinctive obedience, unity, commitment, and esprit de corps." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986); *cf.* Article 89, UCMJ, 10 U.S.C. § 889 (2012) (criminalizing disrespect towards a senior commissioned officer); Article 90, UCMJ, 10 U.S.C. § 890 (2012) (criminalizing willful disobedience of a superior officer).

Also central to the American military's successful operation is respect for the principle of civilian supremacy. *Brown*, 45 M.J. at 397 (noting that the "right [to free speech] must be tempered in a military setting based on … civilian supremacy"); *cf.* Article 88, UCMJ, 10 U.S.C. § 888 (2012) (criminalizing the use of "contemptuous words" by a commissioned officer against the President or other senior officials). It is patently evident that Appellant's speech runs directly counter to the ethos of the United States armed forces. For these reasons, we conclude there is legally sufficient evidence to indicate that Appellant's statements were indeed directly linked to the military mission and environment.

### ii. Balancing Interests Regarding the Proscription of Certain Speech

Both this Court and the Supreme Court have "long recognized that the military is, by necessity, a specialized society separate from civilian society." *Parker v. Levy*, 417 U.S. 733, 743 (1974); *accord United States v. Goings*, 72 M.J.

202, 205 (C.A.A.F. 2013) ("There is no question that Appellant's rights as a member of the military are not coextensive with those enjoyed by civilians."). Consistent with this principle, we have held "the right of free speech in the armed services is not unlimited and must be brought into balance with the paramount consideration of providing an effective fighting force for the defense of our Country." *United States v. Priest*, 21 C.M.A. 564, 570, 45 C.M.R. 338, 344 (1972).

To achieve this balance, we must first weigh the gravity of the evil posed by the speech at issue against the probability of this evil's manifestation. *Id.* ("'In each case (courts) must ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.'" (citation omitted)). If the resulting danger justifies the invasion of free speech necessary to avoid it, the rights of individual servicemembers must yield to the needs of the nation. This, of course, is a question of law, which we review de novo.[14] *See United States v. Sullivan*, 42 M.J. 360, 363 (C.A.A.F. 1995).

The facts of *Priest* are instructive on this point. In *Priest*, this Court was confronted with a servicemember who had edited, published, and distributed an "underground" newsletter[15] in which he "sought to agitate against the

---

[14] There is a fundamental difference between suggesting that "the constitutionally protected status of [speech] may affect legal sufficiency" and suggesting that legal sufficiency review can be used "to determine whether Appellant's [speech] is constitutionally protected." *Goings*, 72 M.J. at 212–13 & n.11 (Stucky, J., dissenting). Only the former assertion is correct. *Id.* at 213 n.11 ("[T]he constitutionally protected status of conduct may affect legal sufficiency, but not vice versa.").

[15] Two specific issues of the newsletter were evaluated in *Priest*. In one, the accused attacked the United States for its involvement in Vietnam and set forth explicit information on how servicemembers could enter Canada in order to desert. *Priest*, 21 C.M.A. at 566–67, 45 C.M.R. at 340–41. In the other, the accused's newsletter took a more violent tone. That issue provided a formula for gunpowder, suggested means to weaken the armed forces from within, and referenced violence against the President, Vice

Vietnam [W]ar and those things he considered unjust in the armed forces." 21 C.M.A. at 566, 45 C.M.R. at 340. We held in that case that "[o]ne possible harm from the [publications] is the effect on others if the impression becomes widespread that … the assassination of public officials [is] acceptable conduct." 21 C.M.A. at 571, 45 C.M.R. at 345. Here, we are faced with a similar scenario.

The danger bred by Appellant's speech about his desire to kill the President was twofold. First, there is the obvious risk that this conduct posed to the ability of Appellant, himself, to function as a member of the military. Statements such as those made by Appellant not only indicate a present disregard for the chain of command, but also forecast a future tendency for the same. This stands at direct odds with the reality that "the primary function of a military … is to execute orders, not debate the wisdom of decisions that the Constitution entrust to … the Commander in Chief." *Priest*, 21 C.M.A. at 571, 45 C.M.R. at 344. Thus, we have recognized that, in the armed forces, this reality strips speech of its constitutional armor in instances where it "undermines the effectiveness of response to command." 21 C.M.A. at 570, 54 C.M.R. at 344.

Second, there is a collateral threat that this disregard for the chain of command might metastasize. This is true "despite the general intelligence and independence of thought that most military persons possess," as not all have the maturity of judgment to resist an invitation to undermine the hierarchy that is central to the fluid operation of the U.S. military. *Cf. Priest*, 21 C.M.A. at 571–72, 45 C.M.R. at 345–46.

In weighing the gravity of these two evils, it must be noted that the perils they pose need not be made manifest in order to warrant censure. "The hazardous aspect of license in this area is that the damage done may not be recognized until the battle has begun." 21 C.M.A. at 571, 45 C.M.R. at 345. It is for this reason that we have recognized that "the

---

President, and Director of the FBI. 21 C.M.A. at 567, 45 C.M.R. at 341.

danger resulting from an erosion of military morale and discipline is too great to require that discipline must already have been impaired before a prosecution for uttering statements can be sustained." 21 C.M.A. at 570, 45 C.M.R. at 344.

### III. CONCLUSION

In regard to the military's decision to prosecute Appellant for the remarks he uttered on November 6, 2012, we note what the Supreme Court acknowledged nearly half a century ago: "The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it." *Parker*, 417 U.S. at 758. Having considered the legal and constitutional aspects of this issue, as well as all of the relevant facts, we conclude that the balance of interests in this case ultimately—and clearly—weighs in favor of proscribing Appellant's speech in which he threatened to kill the President of the United States.

### IV. DECISION

The decision of the United States Army Court of Criminal Appeals is affirmed.

Judge STUCKY, with whom Judge RYAN joins, dissenting.

As a general rule, "a guilty mind is 'a necessary element in the indictment and proof of every crime.'" *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (quoting *United States v. Balint*, 258 U.S. 250, 251 (1922)); *accord United States v. Thomas*, 65 M.J. 132, 133 (C.A.A.F. 2007). The majority concludes that the term "wrongful," as used in the third element of the offense of communicating a threat, has always required that an accused possess a guilty mind. *United States v. Rapert*, __ M.J. __, __ (9) (C.A.A.F. 2016). I disagree with the majority's interpretation and its resulting affirmance of the decision of the United States Army Court of Criminal Appeals. Accordingly, I respectfully dissent.

**I.**

The principal issue in this case arises from the Supreme Court's recent decision in *Elonis*. At its heart, *Elonis* is a reiteration of a longstanding principle of statutory interpretation of federal criminal statutes: "'wrongdoing must be conscious to be criminal.'" 135 S. Ct. at 2012 (quoting *Morissette v. United States*, 342 U.S. 246, 252 (1952)). This means that a "'presumption in favor of a scienter requirement should apply to *each* of the statutory elements that criminalize otherwise innocent conduct,'" *id.* at 2011 (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)) (emphasis in original), and, "when interpreting federal criminal statutes that are silent on the required mental state, [the Court] read[s] into the statute only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct." *Id.* at 2010 (citations omitted) (internal quotation marks omitted); *accord Staples v. United States*, 511 U.S. 600, 605 (1994). This presumption can, however, be overcome in certain situations. *See Elonis*, 135 S. Ct. at 2008–09 (explaining that Congress can "mean[] to exclude a requirement that a defendant act with a certain mental state," but there must be evidence of such an intent); *Liparota v. United States*, 471 U.S. 419, 427 (1985) ("Congress *could* have intended that [a] broad range of conduct be made illegal …. However, given the paucity of material suggesting that Congress did so intend, we are reluctant to adopt such a sweeping interpretation") (emphasis in original); *Balint*, 258 U.S.

at 251–53 (finding that the general presumption of a scienter requirement in criminal statutes is not necessarily applicable to regulatory or public welfare offenses, where "social betterment" and "proper care" are the goals, as opposed to punishment).

Given the well-established nature of the aforementioned principle of statutory interpretation, any novelty in *Elonis* emanates from the Supreme Court's *application* of this principle to the federal statute criminalizing the "transmi[ssion] in interstate or foreign commerce [of] any communication containing any threat to kidnap any person or any threat to injure the person of another." 18 U.S.C. § 875(c) (2012). This federal offense is strikingly similar to the crime of communicating a threat under Article 134, Uniform Code of Military Justice, (UCMJ), 10 U.S.C. § 934 (2012); *Manual for Courts-Martial, United States* (*MCM*) pt. IV, ¶ 110.b. (2012 ed.).

The conviction in *Elonis* was overturned because:

> [t]he jury was instructed that the Government need prove only that a reasonable person would regard Elonis's communications as threats, and that was error. Federal criminal liability generally does not turn solely on the results of an act without considering the defendant's mental state.

135 S. Ct. at 2012. The Supreme Court further found that:

> [h]aving liability turn on whether a "reasonable person" regards the communication as a threat— regardless of what the defendant thinks—"reduces culpability on the all-important element of the crime to negligence," [*United States v. Jeffries*, 692 F.3d 473, 484 (6th Cir. 2012) (Sutton, J., dubitante)], and we "have long been reluctant to infer that a negligence standard was intended in criminal statutes."

*Id.* at 2011 (quoting *Rogers v. United States*, 422 U.S. 35, 47 (1975) (Marshall, J., concurring) (citing *Morissette*)).

Our task is therefore to determine whether the crime of communicating a threat under Article 134, UCMJ, has turned on a mens rea standard of negligence and, if so, to gauge whether the principle reiterated in *Elonis* leads us to reinterpret the level of mens rea required for a finding of guilt.

2

**II.**

The majority correctly notes that the offense of communicating a threat under Article 134, UCMJ, contains four elements:

> (1) That the accused communicated certain language expressing a present determination or intent to wrongfully injure the person, property, or reputation of another person, presently or in the future;
>
> (2) That the communication was made known to that person or to a third person;
>
> (3) That the communication was wrongful; and
>
> (4) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

*MCM* pt. IV, ¶ 110.b. However, it incorrectly concludes that the third element has always required a level of mens rea beyond negligence on the part of an accused.

The majority contends that the third element should be read to require "[t]hat the communication was wrongful in that the speaker intended the statements as something other than a joke or idle banter, or intended the statements to serve something other than an innocent or legitimate purpose." *Rapert*, __ M.J. at __ (10). Yet we have never held that any of this offense's elements include a mens rea requirement beyond negligence.

Looking simply at statutory language, the crime requires only that the accused wrongfully express a present determination or intent to injure a person, property, or reputation. *MCM* pt. IV, ¶ 110.b. We have found that an individual may be convicted when "a reasonable factfinder could conclude beyond a reasonable doubt that a reasonable person in the [hearer's] place would perceive the contested statement by appellant to be a threat." *United States v. Phillips*, 42 M.J. 127, 130 (C.A.A.F. 1995); *accord United States v. Greig*, 44 M.J. 356, 358 (C.A.A.F. 1996). We have further held that "a specific intent on the part of the accused is not itself an element of the offense," *United States v. Humphrys*, 7 C.M.A. 306, 308, 22 C.M.R. 96, 98 (1956), and that "once it clearly appears that a person subject to the Code has an-

nounced an avowed present determination or intent to injure presently or in the future, the offense is complete." *United States v. Rutherford*, 4 C.M.A. 461, 462, 16 C.M.R. 35, 36 (1954). The fact that a communication must be wrongful has never been held to add a mens rea requirement beyond negligence to this offense.

As far as the context and surrounding circumstances of a statement, the *MCM* states that:

> it is not necessary that the accused actually intended to do the injury threatened. However, a declaration made under circumstances which reveal it to be in jest or for an innocent or legitimate purpose, or which contradict the expressed intent to commit the act, does not constitute this offense.

*MCM* pt. IV, ¶ 110.c. And our case law expounds on this:

> The words communicated certainly matter because they are the starting point in analyzing a possible threat. But words are used in context. Divorcing them from their surroundings and their impact on the intended subject is illogical and unnatural. Legal analysis of a threat must take into account both the words used and the surrounding circumstances.

*United States v. Brown*, 65 M.J. 227, 231–32 (C.A.A.F. 2007); *accord United States v. Wartsbaugh*, 21 C.M.A. 535, 537–38, 45 C.M.R. 309, 311–12 (1972). The term "circumstances" allows for the *relevance* of an accused's mental state, but does not, as the majority claims, institute a mens rea *requirement*. *Rapert*, __ M.J. at __ (9) (quoting *United States v. King*, 34 M.J. 95, 97 (C.M.A. 1992) ("The wrongfulness of the act obviously *relates* to *mens rea* … and lack of a defense, such as excuse or justification") (emphasis added)). Rather, a "declarant's true intention, the understanding of the persons to whom the statement is communicated, and the surrounding circumstances may … reveal it to be a mere jest or idle banter." *United States v. Gilluly*, 13 C.M.A. 458, 461, 32 C.M.R. 458, 461 (1963). In this way, mens rea, essentially as part of the surrounding circumstances, can reveal the nonthreatening nature of an ostensibly threatening statement to a reasonable hearer. And the edition of the Military Judges' Benchbook in circulation at the time of trial implements this understanding:

4

> A statement made under circumstances which re-
> veal it to be in jest or for an innocent or legitimate
> purpose which contradicts the expressed intent to
> commit the act is not wrongful …. Consequently, if
> the evidence indicates any such *defense*, the mili-
> tary judge must, *sua sponte*, instruct carefully and
> comprehensively on the issue.

Dep't of the Army, Pam. 27-9, Legal Services, Military Judg-
es' Benchbook ch. 3, ¶ 3-110-1 (2010) (emphasis added). Cer-
tain mental states on the part of an accused can help *negate*
criminality, but they are not positive requirements *for* crim-
inality.

Our case law further implements the interpretation that
criminality is determined by the perception of the reasona-
ble hearer—which can be influenced by external circum-
stances surrounding an accused's statement (including his
mens rea). I have not found a case of ours holding that a
mens rea requirement beyond negligence is an element of
the communicating a threat offense, much less as part of the
"wrongful" element. Nor have I found a case involving this
crime in which we have not based our findings *solely* on the
perception of a reasonable hearer. *See Brown*, 65 M.J. at
232; *United States v. Ogren*, 54 M.J. 481, 486–87 (C.A.A.F.
2001); *Greig*, 44 M.J. at 358; *Phillips*, 42 M.J. at 130; *United
States v. Cotton*, 40 M.J. 93, 95 (C.M.A. 1994); *United States
v. Shropshire*, 20 C.M.A. 374, 375, 43 C.M.R. 214, 215
(1971); *Gilluly*, 13 C.M.A. at 460–61, 32 C.M.R. at 460–61;
*United States v. Sulima*, 11 C.M.A. 630, 633, 29 C.M.R. 446,
449 (1960); *Humphrys*, 7 C.M.A. at 307–08, 22 C.M.R. at 97–
98; *Rutherford*, 4 C.M.A. at 462, 16 C.M.R. at 36. As such,
Judge Latimer's concurrence in the result of *Humphrys* deft-
ly encapsulates this Court's consistent understanding of the
communicating a threat offense:

> Summed up, we have carved out the rule that it is
> the audible pronouncement of an intent or deter-
> mination to injure that constitutes the gravamen of
> the offense. In that setting, it matters not the pur-
> pose behind the declaration, so long as the words
> uttered could cause a *reasonable person* to believe
> that he was wrongfully threatened.

7 C.M.A. at 312, 22 C.M.R. at 102 (Latimer, J., concurring in
the result) (emphasis added).

This is not to say that we have previously been unwilling to ascribe a mens rea requirement to the term "wrongful" in the context of *other* offenses. *E.g.*, *United States v. Thomas*, 65 M.J. 132, 133–35 (C.A.A.F. 2007) (finding that the word "wrongful" within the wrongful use, possession, etc., of controlled substances offense under Article 112(a), UCMJ, creates a requirement that an accused *knew* of the physical presence of the offending substance, *knew* of its contraband nature, and *knew* that he was entering a military installation). But this practice has been the exception, not the rule.

The UCMJ and the explanations of Article 134 offenses in the *MCM* are littered with the term "wrongful." The word, however, is predominantly defined to mean either "without legal justification or excuse" or "contrary to law, regulation, lawful order, or custom" and is placed alongside a specified mens rea requirement, if there is one. *E.g.*, Article 109, UCMJ, 10 U.S.C. § 909 (2012); *MCM* pt. IV, ¶¶ 33, 34, 68.b, 86; Article 110, UCMJ, 10 U.S.C. § 910 (2012). Moreover, whether a statement is uttered in jest or for an innocent or legitimate purpose is treated as a *defense* in the Military Judges' Benchbook, not a mens rea requirement attaching to the word "wrongful." Military Judges' Benchbook at ch. 3, ¶ 3-110-1. For these reasons, when interpreting the word "wrongful" to require a level of mens rea higher than that provided in the statute (or offenses created by the President under Article 134, UCMJ), our custom has been to acknowledge the novelty of such action and assess lower courts' rulings with this in mind. *E.g.*, *Thomas*, 65 M.J. at 135; *United States v. Mance*, 26 M.J. 244, 254–56 (C.M.A. 1988), *overruled on other grounds by United States v. Payne*, 73 M.J. 19 (C.A.A.F. 2014) (acknowledging the novelty of the interpretation that a "knowledge" mens rea standard attaches to the offense at issue through the term "wrongful").

In light of the consistent interpretations noted above, and given that this case was conducted as a bench trial and that "[m]ilitary judges are presumed to know the law and to follow it absent clear evidence to the contrary," *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007), we must presume that the military judge applied a negligence standard in determining whether Appellant possessed the requisite mens rea at the time of his offending conduct. Such

an assumption is further supported by the fact that the specification under which Appellant was charged contains no mention of a mens rea requirement, and the edition of the Military Judges' Benchbook in circulation at the time of trial did not instruct the military judge to apply one. Military Judges' Benchbook, ch. 3, ¶ 3-110-1. The majority therefore incorrectly ascribes the power of clairvoyance to the military judge in determining that he applied a then-nonexistent legal standard at trial. While we should certainly presume that military judges know and follow the law, they do so with regard to the law *as it is when the case is tried*. To presume that they can divine and apply future legal interpretations is an impractical proposition.

### III.

Aside from the majority's error in not acknowledging the novelty of their reinterpretation of the elements of the communicating a threat offense and its enhancement of the mens rea requirement, there are additional problems with the specific language it uses to define the term "wrongful."

Foremost, the majority presents its definition entirely in negative form, making it unnecessarily convoluted. The first part of the majority's definition requires "that the speaker intended the statements as something other than a joke or idle banter." *Rapert*, __ M.J. at __ (10). The language merely declares that those who intend their statements as jokes or idle banter are not guilty of this offense. It avoids the gravamen of the crime by failing to specify the level of mens rea required of an accused in communicating a threat, and negligent criminality is not ruled out. Even if the speaker's mens rea is negligence, any utterance that communicates a threat could still be criminal so long as the speaker's words were not intended as a joke or idle banter. For example, a statement by a frustrated individual, who possesses no actual awareness of the risk that his words will be construed as threatening and with no intent to communicate a threat, could still be perceived by a reasonable hearer as a threat. Such a negligent statement would be intended as neither a joke nor idle banter but may be criminal under the first part of the majority's definition of "wrongful."

The second part of this definition requires that the speaker "intended the statements to serve something other than an innocent or legitimate purpose." *Id.* Put in its positive form, this passage spares criminal liability for those who intend their statements to serve an innocent or legitimate purpose. Presumably, this includes declarations intended as jokes or idle banter. It likely also encapsulates those spoken with the intent to carry out a special defense— i.e., submit to duress or engage in self-defense. But, more broadly, what is an innocent or legitimate purpose under an offense that criminalizes threatening language? Seemingly, it is any other purpose than communicating a threat. If we are to look to the purpose for which language is spoken to determine criminality, we cannot legitimately criminalize language with a purpose other than that targeted by the offense. This would mean that the majority is implementing a purposeful mens rea requirement for the communicating a threat offense: in order to be found guilty, an individual must speak with the purpose of communicating a threat. *See* Model Penal Code § 1.13(12) (Am. Law Inst., Proposed Official Draft 1962) ("'[I]ntentionally' or 'with intent' means purposely").

There are two striking problems with such a requisite mens rea. First, this is an incredibly high bar for prosecution given that

> [a] person acts purposely with respect to a material element of an offense, when:
>
>> (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result.

Model Penal Code § 2.02(2)(a). It is a substantial leap beyond the negligence standard that the communicating a threat offense has carried throughout its entire existence.

Second, in *Elonis*, the Supreme Court specifically stated that possession of a less demanding mens rea suffices for an individual to be found guilty of the comparable communicating a threat offense under § 875(c):

> There is no dispute that the mental state requirement in Section 875(c) is satisfied if the defendant

> transmits a communication for the purpose of issu-
> ing a threat, *or with knowledge* that the communi-
> cation will be viewed as a threat.

135 S. Ct. at 2012 (emphasis added); *see also* Model Penal Code § 2.02(2)(b) ("A person acts knowingly with respect to a material element of an offense when: (i) if the element involves the nature of his conduct or attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result").

On top of the striking problems inherent within the language of the majority's definition of "wrongful," there are additional conspicuous issues with how the majority chose this language. Given the absolute absence of support for its assertion that the term "wrongful" within the communicating a threat offense has always included a mens rea requirement beyond negligence, the majority is forced to overtly misinterpret and misapply military law.

The first half of the majority's definition—"the speaker intended the statements as something other than a joke or idle banter," *Rapert*, __ M.J. at __ (10)—is lifted partly from the *MCM*'s explanation of the communicating a threat offense and partly from our case law. *MCM* pt. IV, ¶ 110.c. ("[A] declaration made under circumstances which reveal it to be in jest … does not constitute this offense"); *Cotton*, 40 M.J. at 95 ("Even when the literal language appears to constitute a threat, 'the surrounding circumstances may so belie or contradict the language of the declaration as to reveal it to be a mere jest or idle banter'") (quoting *Gilluly*, 13 C.M.A. at 461, 32 C.M.R. at 461). But these sources use this language in reference to the impact of an accused's statements on a reasonable hearer, not to explain an additional offense element requiring a mental state on the part of an accused other than negligence. The surrounding circumstances—including the speaker's subjective mindset—can reveal to a reasonable hearer that a statement is a joke or idle banter.

The second half of the majority's definition—"or [the speaker] intended the statements to serve something other than an innocent or legitimate purpose," *Rapert*, __ M.J. at

__ (10)—is derived entirely from the *MCM*'s explanation of the communicating a threat offense. *MCM* pt. IV, ¶ 110.c. ("[A] declaration made under circumstances which reveal it to be … for an innocent or legitimate purpose … does not constitute this offense"). Again, this language allows an innocent or legitimate purpose to be revealed to a reasonable hearer through surrounding circumstances, which can include a declarant's mental state but does not require it as an element of the offense. *Greig*, 44 M.J. at 358 ("*[T]he reference to innocent or legitimate purpose does not delineate the elements of the offense*; rather, it is a reference to the surrounding circumstances [which] may so belie or contradict the language of the declaration as to reveal it to be a mere jest or idle banter") (internal quotation marks omitted) (emphasis added).

## IV.

As noted above, under the principle of statutory interpretation recounted in *Elonis*, we must first determine whether the offense turns on a negligence mens rea standard and then, if so, whether we should heighten this standard so as "to separate wrongful conduct from otherwise innocent conduct." 135 S. Ct. at 2010 (citations omitted) (internal quotation marks omitted).

Analogous to § 875(c) under the federal criminal code, communicating a threat has historically only required negligence on the part of an accused in order to be convicted. If a reasonable person in the hearer's place would perceive the accused's contested statement as a threat, then the accused has satisfied this requirement. *E.g.*, *Phillips*, 42 M.J. at 130. And given the Supreme Court's clear language with respect to § 875(c) and this section's stark similarity to the military's communicating a threat offense, I find *Elonis* to be a highly persuasive authority. I would therefore interpret a mens rea requirement beyond negligence to be present within the offense.

In determining the proper level of mens rea required of an accused to criminally communicate a threat, I agree with Justice Alito's concurrence in part and dissent in part in *Elonis*:

> Once we have passed negligence … no further presumptions are defensible. In the hierarchy of mental states that may be required as a condition for criminal liability, the mens rea just above negligence is recklessness …. [W]hen Congress does not specify a mens rea in a criminal statute, we have no justification for inferring that anything more than recklessness is needed.… Once we have reached recklessness, we have gone as far as we can without stepping over the line that separates interpretation from amendment.

135 S. Ct. at 2015 (Alito, J., concurring in part and dissenting in part). Under a recklessness standard, an accused must have at least been aware of the risk that he was communicating a threat and ignored such risk. *See id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); Model Penal Code § 2.02(2)(c)). To the extent it can be construed as instituting a mens rea standard beyond recklessness, the majority opinion is inappropriately legislating.

As for the matter of in which element of the offense this mens rea requirement should be placed, it should be located within the *first* element. This is where the core of the offensive conduct is outlined, to which any mens rea standard must be applied. Moreover, as presented above, "wrongful" has a historical and widespread meaning that does not include a mens rea requirement. The first element of this offense should therefore read as follows:

> That the accused [recklessly] communicated certain language expressing a present determination or intent to wrongfully injure the person, property, or reputation of another person, presently or in the future.

## V.

In summation, the majority's interpretation of the term "wrongful"—which adds a mens rea element to the offense of communicating a threat—is incorrect. The majority has instituted a novel interpretation of the word "wrongful" and improperly assumes that the military judge intuited and applied this new legal standard. Moreover, the majority's definition of "wrongful," in addition to being imprecise, appears to place too high of a burden on prosecution by requiring an accused to possess a purposeful mens rea in order to be con-

victed of communicating a threat. As such, I reiterate my disagreement with the decision of this Court.