# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

## No. ACM S32749

———————————

### UNITED STATES
*Appellee*

v.

### Makinnon A. MYERS
Airman (E-2), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 22 August 2024

———————————

*Military Judge*: Christopher D. James.

*Sentence*: Sentence adjudged on 28 September 2022 by SpCM convened at Joint Base Pearl Harbor-Hickam, Hawaii. Sentence entered by military judge on 23 November 2022: Bad-conduct discharge, confinement for 165 days, and reduction to E-1.

*For Appellant*: Major Kasey W. Hawkins, USAF; Major Frederick J. Johnson, USAF.

*For Appellee*: Lieutenant Colonel J. Peter Ferrell, USAF; Major Oliva B. Hoff, USAF; Major Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before ANNEXSTAD, GRUEN, and BREEN, *Appellate Military Judges*.

Judge BREEN delivered the opinion of the court, in which Senior Judge ANNEXSTAD and Judge GRUEN joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

BREEN, Judge:

Appellant entered mixed pleas at his court-martial. A military judge sitting as a special court-martial convicted Appellant, consistent with his pleas, of two specifications of making a false official statement and two specifications of wrongfully using a controlled substance (delta-9-tetrahydrocannabinol) in violation of Articles 107 and 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 907, 912a.[1] A special court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of communicating a threat, in violation of Article 115, UCMJ, 10 U.S.C. § 915.[2,3] The military judge sentenced Appellant to a bad-conduct discharge, confinement for 165 days, and reduction to the grade of E-1. The convening authority approved the sentence in its entirety but waived all automatic forfeitures for a period of six months, until Appellant's release from confinement, or until the expiration of his term of service, whichever was sooner, for the benefit of Appellant's spouse and two dependent children.

Appellant raises two issues on appeal: (1) whether Appellant's conviction for communicating a threat is legally and factually sufficient; and (2) whether Appellant's sentence consisting of a bad-conduct discharge was inappropriately severe. Additionally, we consider (3) whether Appellant is entitled to relief for a facially unreasonable appellate delay.

Finding no error that materially prejudiced Appellant's substantial rights, we affirm the findings and sentence.

## I. BACKGROUND

On 13 July 2022, Appellant phoned the Joint Base Pearl Harbor-Hickam Mental Health Clinic (Clinic) and expressed a desire to self-harm. While still on the phone with Appellant, the Clinic contacted Appellant's unit and requested assistance escorting Appellant to the Clinic. They also asked for assistance in retrieving Appellant's medication, which was causing negative side effects. Based on direction from the Clinic, Appellant's first sergeant contacted

---

[1] Unless indicated otherwise, all references to the UCMJ and to the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*).

[2] After the announcement of findings by the president, Appellant's trial defense counsel raised a R.C.M. 917 motion for a finding of not guilty for this specification. The military judge partially granted the motion and found Appellant not guilty of certain charged phrases.

[3] Consistent with his pleas, Appellant was found not guilty of an additional specification of communicating a threat in violation of Article 115, UCMJ.

Appellant's section chief and supervisor to assist him with the requests from the Clinic staff.

When the first sergeant, section chief, and immediate supervisor (escort party) arrived at Appellant's home, Appellant was still on the phone with the Clinic. The escort party asked Appellant for his medication, and he went upstairs to retrieve it. He then told them that he needed to go to the Clinic but that the Clinic instructed him not to hang up the phone until he arrived. The escort party took Appellant to the Clinic.

At the front desk of the Clinic, Appellant appeared "very quiet, [and] very calm." However, after Appellant entered the lobby, he appeared agitated, impatient, and jittery. Appellant indicated on an intake form that he wanted to harm members of his leadership because of the frustration he was experiencing in trying to separate from the military. As a result of Appellant's statements on the form, a mental health technician and a member of the escort party took Appellant into a private office where Appellant's pockets were emptied. According to the technician, Appellant verbally reiterated that he wanted to "kill" "people in his chain of command," that he had been waiting for a year to separate from the military, and that if he was forced back to work the following day he would "hurt the next person" who told him he had to "wait" to be with his family in Tennessee. Appellant told the technician that Appellant's thoughts of harming his leadership reflected his "will" and that "acting on his plan of hurting his leadership [wa]s something he ha[d] to do."

Appellant then met with a psychiatric nurse practitioner and told her he was upset, having a hard time sleeping, and had thoughts of hurting other people—specifically his leadership team and people in the escort party. Appellant also informed the nurse practitioner that he "had thoughts of wanting to kill other people for many years," but over the last day "the thoughts ha[d] changed to desires." He explained that people in his command staff lied to him, and that he "wanted to cut their tongues out and staple [them] to their chests." Appellant expressed that he had wanted to get out of the Air Force for "quite some time" but was being prevented from leaving. Finally, he told the nurse practitioner he could not "leave and be safe" and "felt like he would act on those thoughts if he left."

Upon the psychiatric nurse practitioner's recommendation, emergency medical technicians transported Appellant to Tripler Army Medical Center (TAMC) by ambulance. At TAMC, Appellant remained irritated and impatient. Appellant, while accompanied by the escort party, was placed in a private, padded room in the back of the emergency room where he could not harm himself or others. Multiple treatment personnel came and went from the room to "assess" Appellant, which included routine medical checks and questions about Appellant's mental health history. During questions about his mental health

history, Appellant, while his section chief remained in the room with Appellant's permission, told a mental health professional (characterized as a "nurse" or "somebody in training") that "if he had to wait one more time, that he was going to cut out the commander's or the flight chief's tongue and staple it to their chest[ ]." Appellant's tone was described as "almost like a normal conversation."

When a psychologist arrived, the section chief left the room. After some time passed, the escort party observed the psychologist and Appellant leave the room. Appellant asked several times to leave the hospital, but the psychologist told Appellant that he could not leave. Appellant became "heated" and yelled at the psychologist, saying that he was not staying and that he was going to walk out of the facility. Eventually, Appellant quieted down, became emotional, and started to cry. The staff gave Appellant a phone to call his wife.

Later that night, Appellant told his section chief about posts on a social media platform which led Appellant to believe that making threatening comments would "help him get home to Tennessee."

## II. DISCUSSION

### A. Factual and Legal Sufficiency—Communicating a Threat

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of act could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2107) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The National Defense Authorization Act for Fiscal Year 2021 (FY21 NDAA) significantly changed how Courts of Criminal Appeals (CCA) conduct factual sufficiency reviews. Pub. L. No. 116-283, § 542, 134 Stat. 3388, 3612–13 (1 Jan. 2021). "Congress undoubtedly altered the factual sufficiency standard in amending the statute, making it more difficult for a [CCA] to overturn a conviction for factual sufficiency." *United States v. Harvey*, 83 M.J. 685, 691 (N.M. Ct. Crim. App. 2023), *rev. granted*, __ M.J. __, No. 23-0239, 2024 CAAF LEXIS 13 (C.A.A.F. 10 Jan. 2024). Previously, the test for factual sufficiency required the court, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, to be convinced of the appellant's guilt beyond a reasonable doubt before it could affirm a finding of guilty. *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). "In conducting this unique appellate role, we [took] 'a fresh, impartial look at the evidence,' applying neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (second alteration in original) (quoting *Washington*, 57 M.J. at 399).[4]

The current version of Article 66(d)(1)(B), UCMJ, FACTUAL SUFFICIENCY REVIEW, states:

> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon a request of the accused if the accused makes a specific showing of deficiency of proof.
>
> (ii) After an accused has made a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—
>
>> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

---

[4] The court is mindful that there are contours of the new factual sufficiency review standard that arguably could impact applications of the rule as discussed by this court and our sister service courts. *See United States v. Coe*, 84 M.J. 537, 542 (A. Ct. Crim. App. 2024) (en banc); *United States v. Harvey*, 83 M.J. 685 (N.M. Ct. Crim. App. 2023), *rev. granted*, __ M.J. __, No. 23-0239, 2024 CAAF LEXIS (C.A.A.F. 10 Jan. 2024); *see also United States v. Csiti*, No. ACM 40386, 2024 CCA LEXIS 160 (A.F. Ct. Crim. App. 29 Apr. 2024) (unpub. op.). These contours are not dispositive in this particular case as the evidence does not make determination of factual sufficiency a close call for the specification at issue. Even if we applied our previous factual sufficiency review standard, we would not grant relief as we ourselves are convinced of Appellant's guilt of the specification at issue beyond a reasonable doubt.

> (II) appropriate deference to findings of acts entered into the record by the military judge.

> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*).

"[T]he factfinder at the trial level is always in the best position to determine the credibility of a witness." *United States v. Peterson*, 48 M.J. 81, 83 (C.A.A.F. 1998).

As charged, in order to convict Appellant of communicating a threat, pursuant to Article 115, UCMJ, the Government was required to prove beyond a reasonable doubt the following three elements: (1) that Appellant communicated certain language, specifically "cutting out their tongue[s] and stapling it to their chest, or words to that effect," which expressed a present determination or intent to injure the person or another person, presently or in the future; (2) that the communication was made known to that person or to a third person, namely a nurse and his section chief; and (3) that the communication was wrongful. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 53.b.(1).

The mens rea requirements for the first and third elements of communicating a threat were most recently articulated by the United States Court of Appeals for the Armed Forces (CAAF) in *United States v. Harrington*, 83 M.J. 408 (C.A.A.F. 2023).

> The first element of communicating a threat requires an objective inquiry, analyzing the existence of the threat from the viewpoint of a "reasonable person in the *recipient's place*." This objective inquiry examines both the language of the communication itself as well as its surrounding context, which may qualify or belie the literal meaning of the language. In contrast to the first element, the third element's requirement of wrongfulness is properly understood in relation to the *subjective* intent of the speaker. In determining if the speaker's subjective intent was wrongful under the third element, the key question is not whether the speaker intended to carry out the object of the threat, but rather "whether the speaker intended his or her words *to be understood as sincere*."

*Id.* at 414 (first citing *United States v. Phillips*, 42 M.J. 127, 130 (C.A.A.F. 1995); then citing *United States v. Brown*, 65 M.J. 227, 231 (C.A.A.F. 2007); and then citing *United States v. Rapert*, 75 M.J. 164, 169 n.10 (C.A.A.F. 2016)).[5]

A threat conditioned upon a victim's actions does not preclude a finding that the language used manifested a then-existing determination to injure. *See United States v. Jones*, No. ACM 39766, 2021 CCA LEXIS 73, at *34 (A.F. Ct. Crim. App. 17 Feb. 2021) (unpub. op.) (citations omitted). Rather, it is only "[i]f the threatened injury is stated to be contingent on the occurrence of some event that *obviously could not take place* [that] an accused is not criminally liable." *United States v. Alford*, 34 M.J. 150, 152 (C.M.A. 1992) (emphasis added); *see also Phillips*, 42 M.J. at 131 (holding appellant's conditional threat to victim of "keep your d[*]mn mouth shut and [you] will make it through basic training just fine" was still a threat where there was no reason proffered at trial which would have prevented the victim from discussing appellant's misconduct with others). In addition, unlawful conditions imposed by an appellant as part of their threatening language do not serve as a basis for undermining the threat. *See Alford*, 34 M.J. at 152 ("[I]mposition of a wrongful condition 'does not negat[e] a present determination to injure.'" (quoting *United States v. Holiday*, 16 C.M.R. 28, 33 (C.M.A. 1954))) (additional citation omitted).

### 2. Analysis

Appellant challenges only the first and third elements of the offense in this case. Appellant argues that his conviction for communicating a threat is both legally and factually insufficient because (1) his "threat" was merely conditional and did not express a present intent to harm another, and (2) his statements were not wrongful because they were made for "the legitimate purpose of receiving mental health care."

#### a. First Element – Conditional Threat

Appellant contends that, by stating "*if* he had to wait one more time," the threat was conditioned on waiting and did not represent a present determination or intent to injure anyone. We are unpersuaded.

---

[5] The CAAF analysis reviewed communicating a threat in the context of Article 134, UCMJ, 10 U.S.C. § 934. The applicable version of the offense of communicating a threat for this case is contained in Article 115, UCMJ (effective 1 January 2019). However, the substantive elements of the Article 115 version of the offense mirror the elements contained in the Article 134 version of the offense with the exception that "proof of the Article 134 'terminal element' is no longer applicable." *See MCM*, App. 17, ¶ 53, at A17-9. The *MCM* also explicitly notes that in migrating the offense from Article 134 to Article 115, UCMJ, it is explicitly incorporating the prior caselaw interpretations of "threat" and "wrongful" to the Article 115, UCMJ, version. *See id.*

Here, Appellant, in his section chief's presence, communicated to a "nurse" his desire to cut out the tongues of his commander and flight chief and staple them to their chests.[6] A rational trier of fact could have determined that a reasonable person in the place of the "nurse" could believe Appellant's statements expressed a present determination to injure his superiors and was conditioned only on the status quo of Appellant's stalled separation status—something which obviously could take place. The reasonableness of this determination is underscored by additional evidence properly presented during this trial. This evidence included Appellant repeating the threat to other individuals and his inclusion of additional statements indicating that harming his leadership was "something he ha[d] to do" and how he would act on his homicidal thoughts if he left the Clinic. In turn, the serious nature of these threats was further supported by the responsive actions made by the other mental health personnel, which resulted in a search of Appellant's person for weapons, the need for the presence of security personnel, and a final determination that Appellant's hospitalization was appropriate. All these actions appeared necessary to the mental health professionals to protect the threatened individuals and to appropriately care for Appellant.

### b. Third Element – Legitimate Purpose

Appellant further argues that even if his statements expressed a present determination to injure, the Government could not satisfy the third element of communicating a threat because the threat was made for a legitimate purpose.

A conviction for communication of a threat requires the Government to prove the alleged threat was "wrongful." Appellant argues his statements cannot be considered "wrongful" because he communicated the threats for "the legitimate purpose of receiving mental health care." In support of this argument Appellant cites *United States v. Cotton*, 40 M.J. 93, 95 (C.M.A. 1994) (finding the conviction was legally insufficient because "[t]he evidence [wa]s *uncontradicted* that appellant went to the base mental health clinic in great distress, looking for help," and the statements were made to describe his state of mind and not to make a threat (emphasis added)); *United States v. Gean*, 71 M.J. 553, 554–55 (A. Ct. Crim. App. 2012) (finding appellant's statements were "compelled" by a command-directed evaluation and were made to determine how to "best address his mental and emotional state"); and *United States v. Wright*, 65 M.J. 703, 705 (N.M. Ct. Crim. App. 2007) (concluding "uncontradicted statements" made during guilty providence inquiry indicated the

---

[6] Although the record contains testimony that members of the escort party overheard these statements and they thought the statements may not have been sincere, they were not the intended recipients of the statements and based their opinions on their own histories with Appellant.

statements were for the purpose of obtaining evaluation and treatment). Appellant argues that the facts of this case are similar and do not constitute communicating a threat as a matter of law.

This court is mindful that the important nature of the doctor-patient relationship requires the free exchange of information so that mental health professionals can provide proper treatment to affected patients. The courts in *Cotton*, *Gean*, and *Wright* all dealt with cases where the evidence clearly demonstrated the statements were made *solely* for the purpose of facilitating treatment. Therefore, their holdings that the "threats" were not wrongful were based on the purpose behind the statements rather than merely the status of the individuals who received the statements.

Here, the evidence showed Appellant told multiple mental health professionals that he was frustrated with his administrative discharge processing, that his leadership lied to him, and that he "wanted to cut their tongues out and staple [them] to their chests." Appellant further expressed that "he felt like he would act on those thoughts if he left [the Clinic]." Again, these statements were so believable that mental health personnel requested the presence of security and determined hospitalization was appropriate. However, the Government also presented evidence that directly contradicted Appellant's contention that he made the statements for the legitimate purpose of facilitating his mental health treatment. After mental health personnel at TAMC determined Appellant needed to be hospitalized, he reacted very negatively, became emotional, and expressed his desire not to comply with the treatment plan. Additionally, after speaking with his wife and calming down, Appellant told his section chief about social media posts that he saw and how these posts explained that making threats could expedite his separation from the military. This additional evidence undermines the implication that his threats were made solely for a legitimate medical purpose.

In viewing Appellant's subjective intent at the time he made the statements, a rational finder of fact could determine that Appellant's subjective intent was to have his threats "understood as sincere." *See Harrington*, 83 M.J. at 414. Additionally, a rational finder of fact could determine these "sincere" statements were not made solely for the legitimate purpose of seeking medical treatment but instead to scare his unit and facilitate his discharge. Therefore, the combination of Appellant's belief that the communication would be viewed as a threat along with his illegitimate purpose for making the statement underscores the wrongfulness of his actions and satisfies this element for the offense.

In conclusion, as to legal sufficiency, viewing the evidence in the light most favorable to the Government, a rational trier of fact could have found the essential elements beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297–98.

As to factual sufficiency, Appellant properly made a request for a factual sufficiency review by asserting a specific showing of a deficiency of proof as required under Article 66(d)(1)(B)(i), UCMJ (2024 *MCM*). However, having given appropriate deference to the fact that the court members saw and heard the witnesses and other evidence, the court is not clearly convinced that the finding of guilty was against the weight of the evidence. Thus, the finding is factually sufficient. *See* Article 66(1)(d)(B)(iii), UCMJ (2024 *MCM*).

## B. Inappropriately Severe Sentence

### 1. Additional Background

On 13 July 2022, after communicating threats to injure his supervisors, Appellant remained hospitalized at TAMC for one-and-a-half days. On 14 July 2022, Appellant's commander learned about the incident. On 15 July 2022, Appellant's commander ordered Appellant into pretrial confinement, and Appellant remained in pretrial confinement through the completion of his special court-martial.

In addition to Appellant's conviction for communicating a threat, Appellant also pleaded guilty to two specifications of making a false official statement to avoid going to work and two specifications for wrongfully using gummies containing delta-9-tetrahydrocannabinol, a controlled substance. As part of the Government's sentencing case, the Government presented Appellant's statement detailing the context for his wrongful use of the gummies and false official statements. The Government also presented a document detailing administrative discipline Appellant received during pretrial confinement for "disrespect" and "unauthorized writing" by making "inappropriate" statements in his mail about staff members and other prisoners. Appellant, during his sentencing case, presented evidence related to his awards and decorations, character statements, photographs, and Appellant's oral and written unsworn statements detailing his background, accepting of responsibility for his actions, expressing remorse, and proclaiming the love he has for his family.

### 2. Law

We review sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2016) (footnote omitted). We may affirm only as much of the sentence we find correct in law and fact. Article 66(d)(1), UCMJ (in law); Article 66(d)(1)(A) (2024 *MCM*) (in fact). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citation omitted). Although appellate courts are empowered to "do justice[ ] with reference to some legal standard," we are not authorized to grant mercy. *United States v. Guinn*, 81

M.J. 195, 203 (C.A.A.F. 2021) (quoting *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010)).

### 3. Analysis

Appellant contends that his mental health "struggle[s]" influenced his misconduct and that the offenses for which he was convicted are not "especially serious." He argues that, therefore, a bad-conduct discharge "on top of the confinement in this case" is not appropriate. We are not persuaded a sentence including a bad-conduct discharge is inappropriately severe.

As detailed in Appellant's guilty plea and the evidence admitted at trial and pre-sentencing, Appellant's crimes included drug use, engaging in dishonesty to avoid going to work, and then making threats against his commander and flight chief. Having considered the nature and seriousness of Appellant's misconduct, and matters contained in the entire court-martial record, including his record of service, all matters submitted in mitigation, and his written and verbal unsworn statements, we conclude the adjudged bad-conduct discharge, in addition to 165 days of confinement, and reduction in grade to E-1, fairly and appropriately punishes Appellant for his misconduct. Therefore, the adjudged and entered sentence is not inappropriately severe.

## C. Timeliness of Appellate Review

Although not raised by Appellant, we consider whether Appellant is entitled to relief for a facially unreasonable appellate delay. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). We find no relief is warranted.

We review de novo whether an appellant has been denied the due process right to speedy appellate review. *Id.* at 135 (citations omitted). A presumption of unreasonable delay arises when appellate review is not completed, and a decision is not rendered within 18 months of a case being docketed. *Id.* at 142. Accordingly, we have considered the four factors the CAAF identified in *Moreno* to assess whether Appellant's due process right to timely appellate review has been violated: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Id.* at 135 (first citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); and then citing *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004) (per curiam)).

The CAAF has held that where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). Where the appellant does not prevail on the substantive grounds of his appeal, as in this case, there is no oppressive incarceration. *Id.* at 139. Similarly, where an appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired. *Id.* at 140. With regard to anxiety and concern, "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* Appellant has made no showing of such particularized anxiety or concern with respect the delay in question, and we perceive none.

Accordingly, we consider whether the delay in this case was so egregious as to adversely affect the public's perception of the military justice system. *Toohey*, 63 M.J. at 362. We conclude it was not. With regard to appellate delay, we note this court has issued its opinion just three weeks over the 18-month *Moreno* standard. Appellant filed his initial assignments of error on 6 February 2024—370 days after his case was docketed and after seeking and being granted 10 enlargements of time over the Government's opposition. The Government submitted its answer on 7 March 2024. Appellant submitted his reply brief on 14 March 2024. In the absence of any particularized prejudice to Appellant, we find the delay did not violate Appellant's right to due process. Finally, recognizing our authority under Article 66, UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude no such relief is appropriate.

## III. CONCLUSION

The findings and sentence as entered, are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court